The HOOPA VALLEY TRIBE

v.

The UNITED STATES.

No. 568–77.

United States Court of Claims.

March 21, 1979.

Jack Tomlinson, San Francisco, Cal., for plaintiff; Neil R. Bardack, Tomlinson & Bardack, Michael Kip Maly and Murphy, Weir & Butler, San Francisco, Cal., of counsel.

James E. Brookshire, Springfield, Va., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D.C., for defendant; C. David Redmon, of counsel.

Before DAVIS and KUNZIG, Judges.

### ON PLAINTIFF'S MOTION TO RE-TRANSFER AND DEFENDANT'S MOTION TO DISMISS

PER CURIAM:

This case comes before the court on plaintiff's request for review by the court of the recommended decision of Trial Judge David Schwartz, filed July 13, 1978, on plaintiff's motion to retransfer the case to the United States District Court for the Northern District of California and on defendant's motion to dismiss the petition (complaint). Oral argument has been had and the court has also considered the written briefs of the parties. Since the court agrees with the recommended decision of the trial judge, as hereafter set forth, it affirms and adopts that decision, together with the following supplemental paragraphs, as the basis for its judgment in this case.

1. On the question of the jurisdiction of the District Court and of this court, we add the following to the trial judge's discussion (which, as stated above, we adopt): As the trial judge points out, it is by now firmly established that, where the prime effort of the complaining party is to obtain money from the Federal Government, this court's exclusive jurisdiction over non-tortious claims (above $10,000) cannot be evaded or avoided by framing a District Court complaint to appear to seek only injunctive, mandatory, or declaratory relief against Government officials or the Federal Government. *See American Science & Engineering, Inc. v. Califano*, 571 F.2d 58 (1st Cir. 1978), and cases cited; *Sherar v. Harless*, 561 F.2d 791, 793–94 (9th Cir. 1977); *Alabama Rural Fires Ins. Co. v. Naylor*, 530 F.2d 1221, 1226–30 (5th Cir. 1976); *International Engineering Co., Div. of A-T-O, Inc. v. Richardson*, 167 U.S.App.D.C. 396, 512 F.2d 573 (1975), *cert. denied*, 423 U.S. 1048, 96 S.Ct. 774, 46 L.Ed.2d 636 (1976); *Warner v. Cox*, 487 F.2d 1301 (5th Cir. 1974); *Mathis v. Laird*, 483 F.2d 943 (9th Cir. 1973). Here, the objective of the suit is obviously to force payment by the Government to plaintiff (and its members) of all the monies derived from the timber of the Square of the Hoopa Valley Reservation, instead of the lesser share due plaintiff (and its members) under *Short v. United States*, 486 F.2d 561, 202 Ct.Cl. 870 (1973), *cert. denied* 416 U.S. 961, 94 S.Ct. 1981, 40 L.Ed.2d 313 (1974). The jurisdiction of this court over this kind of suit is as clear as it was in *Short, supra*, and the multitude of other cases seeking payment from the Treasury of monies to one or another Indian tribe or Indian individuals.[1] Conversely, under the

---

1. The trial judge rightly points out that the United States holds legal title to Indian funds held in the Treasury. Plaintiff says that, even so, this court has no jurisdiction where the only

authorities cited *supra*, the District Court lacks jurisdiction of this action (even though framed purely in equitable or declaratory terms) which attempts, in direct impact, to obtain these monies from the Treasury.[2]

■ 2. On the merits, we agree with the trial judge (for the reasons he gives) that, with one possible exception, all of the issues now raised by plaintiff[3] were decided adversely to it in the *Short* litigation, and cannot now be pursued because of the doctrines of collateral estoppel and res judicata. Counts I and II of the complaint basically raise issues litigated and determined against plaintiff in *Short*—as Trial Judge Schwartz demonstrates.[4] Plaintiff had a full and fair opportunity to litigate each of those issues before this court made its determination, and application of collateral estoppel is in no way unfair. *See Parklane Hosiery Co. v. Shore*, —— U.S. ——, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). The precise issue presented in Count III did not arise before this court's first determination in *Short* but issues underlying and determining that particular question were litigated and decided in *Short*; moreover, plaintiff has been (on its own intervention) a party to all proceedings in the Trial Division since the court's liability decision in *Short*, 486 F.2d 561, 202 Ct.Cl. 870 (1973),

cert. *denied*, 416 U.S. 961, 94 S.Ct. 1981, 40 L.Ed.2d 313 (1974), and could and should have presented, in that litigation, the apportionment problem it now seeks to raise in Court III. *Cf.* Restatement (Second) of Judgments § 56.1(2) ("Effect of Failure to Interpose Counterclaim") (Tent. Draft No. 1, 1973).

The one issue now presented by plaintiff which may not have been directly litigated and decided in *Short* is whether the United States is liable to the Hoopa Valley Tribe because, over a period of years, the Government told the Tribe that the latter alone owned the timber of the Square and this court later determined otherwise when other Indians brought suit in the *Short* litigation. But that unusual contention need not detain us long. The first thing to note is that the Government fought extremely hard against the *Short* plaintiffs (to the extent of seeking review in the Supreme Court) and attempted as long as it reasonably could to vindicate its position that the Square timber belonged only to the Hoopa Valley Tribe (and its members). Also, it is impossible to say that the Government's position was frivolous, insubstantial or unreasonable; indeed, plaintiff Hoopa Valley Tribe should be the last to take such a position[5] since it, too, fought mightily

---

issue is which set of Indians will obtain the money, and accordingly there will be no net detriment to the Treasury. The error in that proposition is shown, not only by the numerous cases (before the Indian Claims Commission and before this court) in which Indian tribes contend over which one shall be paid for the taking or loss of certain property, but also by this court's third-party practice (41 U.S.C. § 114(b)(1976); Ct.Cl.R. 41) which contemplates that the court will consider conflicting claims to money held by the United States. *See Richfield Oil Corp. v. United States*, 151 F.Supp. 333, 335, 138 Ct.Cl. 520, 522–23 (1957); *Christy Corp. v. United States*, 387 F.2d 395, 396, 397, 181 Ct.Cl. 768, 771, 772 (1967); *Bowser, Inc. v. United States*, 420 F.2d 1057, 1062, 190 Ct.Cl. 441, 448–49 (1970). Plainly, the plaintiff relied on that principle when it sought to intervene, before the court rendered its decision, in the *Short* litigation.

2. Insofar as plaintiff's argument is that this court has no jurisdiction over a monetary claim which is equitable in nature, that contention is

incorrect. *Pauley Petroleum Inc. v. United States*, 591 F.2d 1308, at 1315–1317 (Ct.Cl. 1979); *Mitchell v. United States*, 591 F.2d 1300 (Ct.Cl.1979).

3. To discover the issues now raised, we have taken account of the complaint filed in the District Court as interpreted and explained by plaintiff's briefs on the current motions.

4. It must not be forgotten that, not only did the Hoopa Valley Tribe participate actively as *amicus* in the proceedings in the Trial Division, but that at the court level it requested and was granted full intervention as a party.

5. In the District Court, before transfer, counsel for the Tribe in this case curiously argued that the Federal Government should have known that other Indians could properly claim the Square timber. That same argument is incorporated in its briefs to us in this case.

(through different counsel) in *Short* for the other result and the Tribe still considers our conclusion to be wrong (as shown by other parts of plaintiff's argument in this very case). The United States, having at all times acted reasonably, cannot be convicted of breach of trust to the Hoopas because this court subsequently held that it was wrong in its belief as to sole Hoopa ownership and our ruling forced a change in distribution of the timber revenues. *See United States v. Mason*, 412 U.S. 391, 397–400, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973). Plaintiff's breach-of-trust claim simply has no valid foundation.

Accordingly, on the basis of the trial judge's opinion as supplemented above, plaintiff's motion to retransfer to the District Court is denied, the defendant's motion to dismiss the complaint (which we treat as a petition in this court) is granted, and the petition is dismissed.

### OPINION OF TRIAL JUDGE

SCHWARTZ, *Trial Judge* : The plaintiff, Hoopa Valley Tribe, has moved under 28 U.S.C. § 1506 (1976) to retransfer this case to the District Court for the Northern District of California, as a case within the exclusive jurisdiction of that court. On motion of the United States the district court had previously transferred the case to this court under 28 U.S.C. § 1406(c) (1976), as a case within this court's exclusive jurisdiction. The motion has been heard, and this recommended opinion and decision is filed, pursuant to an order of reference of March 21, 1978.

In the Tribe's complaint, as filed in the District Court, the named defendants were the Secretary of the Interior and the Commissioner of the Bureau of Indian Affairs. The prayer was for equitable and declaratory relief. The district court, nevertheless, ruled that "this action is essentially one for a money judgment against the United States, and the Court of Claims has exclusive jurisdiction over this action [see *Mathis v. Laird*, 483 F.2d 943, 944 (9th Cir. 1973)]." *Hoopa Valley Tribe v. Andrus*, No. C–76–1405 RHS (N.D.Cal. Oct. 20, 1977). The district court thereupon substituted the United States for the named defendants and transferred the case to this court.

In moving to retransfer, plaintiff contends, as it did in the district court, that the action seeks only equitable and declaratory relief against Government officers, and is thus within the exclusive jurisdiction of the district court under 28 U.S.C. § 1331(a) *as amended by* Act of Oct. 21, 1976, Sec. 2, Pub.L. 94–574, 90 Stat. 2721, and 28 U.S.C. §§ 1361–1362 (1976) and 5 U.S.C. §§ 701–706 (1976), especially § 702 *as amended by* Act of Oct. 21, 1976, Sec. 1, Pub.L. 94–574, 90 Stat. 2721.

A second motion, by the Government, seeks the dismissal of the complaint on the ground of res judicata or collateral estoppel. This motion originated in the hearing on the motion to retransfer, where much of the Government's argument was to the effect that the Tribe was seeking to relitigate issues decided against it in *Short v. United States*, 486 F.2d 561, 202 Ct.Cl. 870 (1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1981, 40 L.Ed.2d 313 (1974), to which the Tribe responded that jurisdiction, and not res judicata, was the only issue before the court on the motion to retransfer. The trial judge thereupon invited the Government to move to dismiss the complaint on the ground of res judicata, so that all the contentions could be considered at one time. The motion was made, referred to the Trial Division by order of May 26, 1978, and both motions have now been briefed.

Both parties urge that issues decided by the district judge should not be reconsidered. The Tribe argues against disturbance of the district court's denial of the Government's motion for summary judgment on the ground of res judicata. The Government argues against disturbance of the district court's denial of its own jurisdiction. Neither argument is persuasive. A transcript of proceedings before the district judge shows sufficiently that he would be willing to reconsider the matter of jurisdiction, if the Court of Claims sent the case back. As for the district judge's decision on res judicata, if that ruling is the law of the

case, it is nevertheless not conclusive. Since the district judge could reconsider the matter upon a retransfer, it may here be reconsidered. Besides, the district judge could not have been as familiar as this court with the issues litigated and decided in *Short*. The record in *Short* was unavailable to him and the text of the decision, as cited to him in the *Federal Reporter*, does not include the findings, which as will be seen are highly relevant on the res judicata-relitigation aspect of the case.* The merits of the contentions with respect to all issues will therefore be addressed.

The origins of the controversy in both *Short* and the instant case go back to the early 1950's and the growing value of the timber in the portion known as the Square of the Hoopa Valley Reservation in Northern California. The Square is an area 12 miles square which constituted the entire original reservation when it was established in 1864. 486 F.2d 561, 202 Ct.Cl. at 888–99, findings 10–21. Hoopas and other Indians lived on the Square at that time and thereafter, although as time went on and members of Indian bands intermarried, apparently most or all of the Indians of the Square thought of themselves as Hoopas. 486 F.2d 561, 202 Ct.Cl. 899–900, 901–02, findings 22–28, 30–32. An area contiguous to the Square, inhabited primarily by Yurok Indians and known as the Addition, was added to the Reservation in 1891. 486 F.2d 561, 202 Ct.Cl. at 902–03, findings 33–34. A portion of the Addition known as the Connecting Strip needs no mention here.

At least in modern times, there has been no particular timber on the Addition. The Square, a deep valley on the Trinity River, is heavily wooded. On May 13, 1950, the Indians of the Square organized themselves as the Hoopa Valley Tribe (486 F.2d 561, 202 Ct.Cl. at 962, finding 145); none of the tribes inhabiting the Reservation in aboriginal times were organized as such (486 F.2d 561, 202 Ct.Cl. at 950–51, findings 109, 111–112). In the late 1950's the Secretary of the Interior, on the basis of an opinion by the Solicitor, 65 Dec.Dept.Int. 59 (1958), began to distribute the revenues from the unallotted trust timberlands of the Square, annually, to the members of the Tribe per capita, to the exclusion of the Indians of the Addition. 486 F.2d 561, 202 Ct.Cl. at 970–73, findings 166–174.

In 1963 the excluded Indians brought suit for what they claimed was their share of the timber revenues. Some 3,300 persons joined as plaintiffs, alleging themselves Yuroks of the Addition. In *Short* the court ruled that every Indian of the Reservation is equally entitled to a share of the profits from trust timberlands wherever located on the Reservation. 486 F.2d 561, 202 Ct.Cl. 870. The Hoopa Valley Tribe, essentially the real party defendant on behalf of its members, participated in the trial as an *amicus curiae*. Through its counsel, the Tribe cross-examined plaintiffs' witnesses, examined witnesses for the defense, introduced exhibits, stipulated facts and briefed the legal issues. In the course of the review by the court of the trial proceedings, the Tribe was permitted to intervene as a party defendant. 486 F.2d 561, 202 Ct.Cl. 870, 873.

Following the denial of certiorari on petition of both the Tribe and the United States, 416 U.S. 961, 94 S.Ct. 1981, 40 L.Ed.2d 313 (1974), the case proceeded to the laborious task of determining which of the 3,800 plaintiffs (additional plaintiffs were now permitted to intervene) are bona fide Indians of the Reservation equally entitled with all other such Indians to a per capita share of the annual timber revenues. The making of these determinations has raised difficult and novel issues of qualification and disqualification by place of birth, degree of Indian blood, residence and other considerations.

As a starting point to determining which Indians were qualified, each plaintiff filled out a life-history questionnaire developed and agreed upon by both sides. The answers to the questionnaires now have been scrutinized, checked and objected to by the defendants, the United States and the Hoo-

---

* It is not clear from the record before us whether the District Court had our findings before it.

pa Valley Tribe. Presently, consideration of cross-motions for summary judgment for and against some 3,200 plaintiffs has been suspended at the joint request of the parties, so that they may explore the possibility of a mediated final resolution to the controversy.

Upon the denial of certiorari to this court's decision that all the Indians of the Reservation were equally entitled to the timber revenues, the Secretary of the Interior ceased to distribute the revenues exclusively to the members of the Hoopa Valley Tribe. On the theory that all 3,800 plaintiffs could eventually be held entitled to 70 percent of the revenues and the 1,500 members of the Hoopa Valley Tribe entitled to 30 percent, the Secretary put 70 percent of the annual timber revenues in escrow pending final decision on the number of the plaintiffs in *Short* qualifying as Indians of the Reservation entitled to per capita distributions of timber revenues. According to the complaint in the present case, the escrow fund now amounts to over $10 million.

The Hoopa Valley Tribe objected, unsuccessfully, to the administrative action escrowing part of the revenues. After exhausting its administrative remedies, the Tribe brought suit in the Northern District of California against the Secretary of the Interior and the Commissioner of the Bureau of Indian Affairs challenging the sequestration of funds. As already noted, the district court transferred the case to this court in the belief that this court has exclusive jurisdiction. Plaintiff seeks a retransfer, asserting the case to be within the exclusive jurisdiction of the district court as a claim for equitable and declaratory relief beyond the jurisdiction of the Court of Claims and different from the relief available in the Court of Claims in the *Short* case. The Government to the contrary contends the suit to be one for money, within the exclusive jurisdiction of the Court of Claims and dismissible as a transparent effort to relitigate issues already decided in *Short.*

The complaint in the present suit has three counts. The parties' contentions regarding jurisdiction and res judicata or its closely related doctrine, collateral estoppel, will be discussed with respect to each count. There is no need in this case to distinguish between res judicata and collateral estoppel, two doctrines which embody the principle of the finality of adjudicated matters.[1] "Res judicata" is often used broadly to refer to all binding effects of former adjudications and will be so used here.

### The Defense of Res Judicata to Counts I and II

*Count I.* Count I alleges that plaintiff, a tribe "since time immemorial" has from the founding of the Reservation "treated the entire 12–mile Square as its exclusive homeland"; that the timberlands of the Square have at least since 1955 been the exclusive property of the plaintiff by conveyance from the United States authorized by Congress; that the plaintiff's ownership was recognized, from 1955 to 1974, by annual per capita payments of timber revenues and otherwise; that in 1974, 70 percent of the timber revenues were sequestered and "permanently taken" to be used for purposes, other than distribution to plaintiff, deemed by the defendants to be "appropriate for the best interests of the United States of America." No mention is made of the decision in *Short* or of that decision as the reason for the challenged sequestration by the Secretary and the Commissioner.

---

1. The term "res judicata" has often been used to denote the preclusion of relitigation of a claim by a judgment, when the same parties or those in privity with them and the same cause of action are involved in a second suit (regardless of whether all grounds for recovery or defenses were determined). "Collateral estoppel" refers to the operation of res judicata in a subsequent suit on a different cause of action raising issues determined in the former action. *See Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); 1B Moore's Federal Practice ¶ 0.405(1) (2d ed. 1974); Developments in the Law—Res Judicata, 65 Harv.L.Rev. 818, 820 n. 1 (1952). Another set of more modern terms is "merger", "bar" and "claim preclusion" or "extinguishment", on the one hand, and "issue preclusion" on the other. *See* Restatement (Second) of Judgments (Tent. Draft No. 1, 1973) (Introductory Note to Ch. 3, 1; Introductory Note to Ch. 3, Topic 2, Title E, 143).

It is further alleged that the "sequestration" by the Secretary and the Commissioner is "a taking of plaintiff's private property for public use without just compensation by defendants * * * and is violative of the Fifth Amendment of the United States Constitution"; and that plaintiff has "been deprived of monies which it owns" in excess of $10 million plus interest.

The plaintiff Tribe requests a declaratory judgment that it is "the lawful and exclusive owner of the timber and the proceeds therefrom" and that "the sequestered proceeds be distributed to plaintiff forthwith and that all such future proceeds be distributed solely to plaintiff and its members." Plaintiff seeks also a temporary injunction, until the claim for declaratory relief is finally adjudicated, against any distribution of the proceeds to persons other than plaintiff.

A bolder attempt than Count I to relitigate issues and claims decided in *Short,* in the guise of a declaratory judgment action, can hardly be imagined. In *Short,* in which conflicting claims were made to ownership of the timberlands on the Square and the proceeds therefrom, the court decided that plaintiff was not a tribe from time immemorial but was created in 1950, not long before the first distribution of timber revenues (486 F.2d 561, 202 Ct.Cl. at 959–67, findings 136–156); that neither plaintiff Tribe nor its members exclusively owned the unallotted trust lands of the Square and that plaintiff's members were not entitled to more than shares in the proceeds equal to those of all the Indians of the Reservation (486 F.2d 561, 202 Ct.Cl. at 884–85, 976–79, 980–81 and findings 184, 185, 188, 189).

The claim that the Hoopa Tribe was the exclusive owner of the timberlands was squarely rejected, in favor of a determination that all the Indians of the Reservation owned equal shares. Now in Count I the plaintiff alleges the opposite and seeks declarations which by adjudging the Tribe to be the "exclusive owner of the timber and the proceeds therefrom" would squarely reverse the decision in *Short.* The count is patently defective under the doctrine of res judicata. Comment on the issue of jurisdiction is for the moment postponed.

*Count II.* This count adds the following to the allegations in Count I of exclusive ownership of the Square's timberlands by the plaintiff Tribe: that in the program for the allotment of lands of the Reservation, in 1892–1933, the residents of the Addition received allotments averaging 44 acres each and the residents of the Square received allotments averaging 5 acres; that the unequal allotments created "a duty owed by defendants and their predecessors" to hold the timberlands of the Square in trust "solely for the benefit of plaintiff and its members"; that since 1974 the defendants have diverted 70 percent of the revenue from the timberlands to a new trust for Indians of the Addition. The alleged resultant "taking" is said to be a breach of defendants' fiduciary obligation to plaintiff and a denial of equal protection of the law. Defendants, it is said, "must restore the assets of plaintiff's trust which have been wrongfully taken."

The prayer is for a judgment against defendants, the Secretary of the Interior and the Commissioner, "in their capacity as trustees for plaintiff," declaring their breach of trust for having distributed Reservation lands to be "in denial of due process and equal protection of the law" and asking for a "judgment mandating defendants to restore the assets of plaintiff's trust which have been taken." The allegations as to fiduciary duty, breach of trust and diversion of trust property, due process and equal protection add only additional legal theory to the allegations in Count I of a nonrecognition of the plaintiff Tribe's exclusive title to the timberland and its revenues. The only matter new in Count II over Count I is the allegation that plaintiff's exclusive ownership arose from unequal allotments of land on the Addition and the Square. This contention or one very like it—that the unequal allotments were recognition that the Square was a separate reservation, owned, with its timberlands, exclusively by the Hoopas—was made, considered and rejected in the course

of the litigation in *Short, see* 486 F.2d 561, 202 Ct.Cl. 870, 925–50, 979–80, findings 78–108, 186.

The argument is frivolous. The number of applicants for allotment of land near their homes and the amount of land available for allotment was such that the Indians of the Square received on an average much smaller allotments than the Indians of the Addition. The timberlands on the Addition, deemed not suitable for individual husbandry, were not allotted and kept by the Government as trust lands. The allotment program and its relation to the case were fully explored in findings 78–108, 186 of the decision in *Short* and the arguments of the Tribe based on the program were rejected. Only the desire to believe can find in the facts of the allotments evidence in support of the claim—squarely contrary to the claim determined in *Short*—that the Hoopas, as the Tribe constituted on the Square have title to the trust timberlands located on the Square. For a description of the allotment program generally see M. Price, Law and the American Indian—Readings, Notes & Cases 531–72 (1973); D. Getches, D. Rosenfelt & C. Wilkinson, 2 Federal Indian Law 844–71 (1977).

In any event, the decision in *Short* was against the Hoopa's claim of exclusive ownership, and Count II of the present complaint renews the same claim. The introduction of Government officers as the alleged takers and wrongdoing trustees adds nothing to the earlier case, in which the United States was correctly recognized by all as the authority in charge of the Reservation, its timberlands and the distribution of the revenues therefrom. And the present argument based on the allotment program is merely an additional legal argument in a second suit between the same parties on the same claim.

It is suggested that in this suit against the United States, the Hoopa Valley Tribe is not bound by the adjudication in *Short* because the two were not adversaries in that case; that the doctrine of res judicata or at least that part of it referring to the preclusion of relitigation of claims is limited to adversaries in the former suit. The contention ignores the force of the relationships among the parties to *Short.* Plaintiff Yuroks there were suing a trustee, the United States, for an adjudication that they were co-beneficiaries with the Hoopas. The Hoopa Tribe came into the case as an *amicus* aligned with the Hoopa's trustee, the defendant United States. The Tribe, as an *amicus,* examined and presented witnesses and briefed the issues, intervened as a co-defendant, and suffered a final judgment rejecting the Tribe's claim to exclusive Hoopa ownership and adjudicating that the Yuroks were co-beneficiaries with the Hoopas, on a per capita, equal basis, of the trust administered by the United States. Now the Hoopa Tribe purports to relitigate with the United States, its trustee (or the trustee's officers, which comes to the same thing), the claim of the Hoopas to sole-beneficiary status, and if the Hoopas are not to be sole beneficiaries, the relative shares of the Hoopas and Yuroks. These are the very issues determined, against the contentions of both the Hoopas and their trustee, United States, in *Short.*

■ It would be destructive of the policy against relitigation of matters determined by judgments to allow such a relitigation on the ground that the Hoopa Tribe and the United States were not adversaries in the earlier case. And it is not the law that the Hoopa Tribe may relitigate this claim with its former co-defendant, its trustee. A short answer to the Tribe's contention that it was not an adversary of the United States might be based on the relationships of the three parties to *Short.* But it is enough to say that the Tribe would be bound by the former judgment, even if the United States had not been a party to the former suit. "A party [the Tribe] precluded from relitigating an issue with an opposing party [the Yurok plaintiffs in *Short*] * * is also precluded from doing so with another person [the United States] unless he [the Tribe] lacked full and fair opportunity to litigate the issue in the first action or unless other circumstances justify affording him an opportunity to relitigate the issue.

* * * ". Restatement (Second) of Judgments (Tent. Draft No. 2, 1975), § 88. This is the rule of *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), and of other cases collected in the Reporters Note to the cited section 88 of the Restatement (Second) of Judgments. There being no circumstances justifying affording the Tribe an opportunity to relitigate the issue, and the Tribe having had a full and fair opportunity to do so in *Short,* it is now bound by the former judgment.

Count II is for the same reasons as Count I barred by the doctrine of res judicata as seeking to relitigate a claim formerly determined.

### *Jurisdiction—in District Court or Court of Claims—of Counts I and II*

Both counts I and II are demands for the payment of money. In count I the Tribe "requests the court to declare" that the sequestered proceeds be "distributed to plaintiff forthwith" and that future proceeds be "distributed solely" to plaintiff. Count II asks for a "judgment mandating defendants to restore the assets of plaintiff's trust which have been taken." The complained-of takings and diversions were done by officers of the United States, acting as such, in their official capacities, with respect to money held in the Treasury of the United States. A claim that such defendants pay out such money from the Treasury is obviously not a claim against the officers personally but a claim against the United States for the sums involved. Exclusive jurisdiction of such claims in excess of $10,000 is lodged in the Court of Claims, under sections 1491 and 1346(a)(2) of Title 28 U.S.C.

It is true, as plaintiff Tribe often repeats, that the Court of Claims has no jurisdiction of suits for injunctions or declaratory judgments *United States v. Jones,* 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1889); *United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). But a suit for money of the United States, over which the Court of Claims has exclusive jurisdiction, cannot be converted into a suit for injunctive relief, over which the Court of Claims has no jurisdiction, merely by naming a Government officer as defendant and praying for an injunction that the money of the United States, in its Treasury, be paid by the named defendant. A Congressional grant of exclusive jurisdiction cannot be so easily circumvented.

The complaint in plaintiff's case is surely one against the United States, for money, by the test laid down in *Land v. Dollar,* 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947): that the suit is against the sovereign (and not its officers) if "the judgment sought would expend itself on the public treasury or domain * * * ". 330 U.S. at 738, 67 S.Ct. at 1012, *quoted with approval in Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). Since the Treasury would be the source of the money which would pass, were plaintiff to have the injunctive relief it seeks, the action is thus one for money against the United States.

Plaintiff would have it that the money here involved is not Government money but Indian money, held by the United States for Indians. In fact, legal title to the funds rests with the United States, which holds the money for the beneficial owners, determined to be such in the decision in *Short,* the "Indians of the Hoopa Valley Reservation."

The legal posture of Indian trust funds held in the federal Treasury was discussed by the Court of Claims in *Confederated Salish and Kootenai Tribes v. United States,* 175 Ct.Cl. 451, *cert. denied,* 385 U.S. 921, 87 S.Ct. 228, 17 L.Ed.2d 145 (1966). There the plaintiff Indian tribes had argued that the Government's use of their trust funds necessarily amounted to a Fifth Amendment taking of their property. The Court rejected this contention in the following passage (175 Ct.Cl. at 455):

> Even on the technical level, the flaw in this argument is that legal title to the funds on deposit in the Treasury lay in the United States. * * * The Indians' interest was, at most, that of a beneficiary, and a trustee's failure to live up to

the standards imposed upon him is not a taking of title from the cestui but a breach of obligation.

The jurisdiction of this court over actions for money encompasses actions for money held by the Government for Indians, whether the relationship is called a trust, as in *Confederated Salish and Kootenai Tribes, supra,* or a holding pursuant to an implied contract, as in *Fields v. United States,* 423 F.2d 380, 191 Ct.Cl. 191 (1970). *Short* was such a case and jurisdiction was assumed. *See also Coast Indian Community v. United States,* 550 F.2d 639, 213 Ct.Cl. 129 (1977); *Cheyenne-Arapaho Tribes v. United States,* 512 F.2d 1390, 206 Ct.Cl. 340 (1975). Accordingly, the suit is against the United States for money in its Treasury, in the amount of $10 million and more. The United States is suable for such amounts of money only in the Court of Claims, and not in the district court in the form of a suit against the Secretary of the Treasury and the Director of the Bureau of Indian Affairs, as officers subject to suit in district court.

The *Land v. Dollar* test appears in the context of a decision on sovereign immunity, but the principle is directly applicable here, because a recent limited congressional waiver of sovereign immunity for suits against officers has explicitly preserved sovereign immunity to suits against officers for money damages, and thus underscored the limitations of Tucker Act jurisdiction, by which suits for sums in excess of $10,000 are committed exclusively to the Court of Claims. 28 U.S.C. §§ 1491, 1346(a)(2) (1976). The reference is to a 1976 amendment to the Administrative Procedure Act, Act of October 21, 1976, Pub.L. 94–574, § 1, 90 Stat. 2721, which added to section 10 of that Act, 5 U.S.C. § 702 (1976), this sentence:

An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on

the ground that it is against the United States or that the United States is an indispensable party. * * *

This enactment, coupled with the simultaneous removal of any requirement of jurisdictional amount for district court jurisdiction of federal question suits against Government officers, 28 U.S.C. § 1331(a) *as amended by* Pub.L. 94–574, § 2, 90 Stat. 2721, reinforces the division of jurisdiction between district court and Court of Claims in which the latter is given exclusive jurisdiction over money claims against the United States in excess of $10,000.

The effect of Pub.L. 94–574, for present purposes, is twofold. Sovereign immunity is waived, consent to sue is given, and jurisdiction is granted, for suits in the district courts against Government officers and agencies raising federal questions, excepting suits for money damages. *Cf. Califano v. Sanders,* 430 U.S. 99, 105–07, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (opinion by Brennan, J.); *Fitzgerald v. United States Civil Service Commission,* 180 U.S.App.D.C. 327, 554 F.2d 1186 (1977). *See also* Jacoby, *Roads to the Demise of the Doctrine of Sovereign Immunity,* 29 Ad.Law Rev. 265 (1977). Suits against officers for money damages in the district court are not consented to; for such suits sovereign immunity still prevails. Only in the Court of Claims, in an action against the United States under the Tucker Act, is there consent to suits seeking trust monies or money held pursuant to contract, in excess of $10,000. 28 U.S.C. §§ 1491, 1346(a)(2) (1976).

The net of Pub.L. 94–574 and the Tucker Act establishes a dichotomy not unlike that in the courts of equity and law in olden days. Suits against Government officers for specific relief may now be brought in the district court, and suits for money are to be brought in the Court of Claims. This is not to say that the newly authorized suit will be successful. The amendment by Pub.L. 94–574 to section 10 of the Administrative Procedure Act concludes with the proviso that:

Nothing herein (1) affects other limitations on judicial review or the power or

duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought. Pub.L. 94–574, § 1, 90 Stat. 2721. The inhibitions on the review of Government agency action are well-known—ripeness, exhaustion of administrative remedies and the like—and the framers of Pub.L. 94–574 disclaimed all intention except to lift the bar of sovereign immunity to suits in district court against Government officers for other than money damages. H.R. Rep. No. 94–1656, 94th Cong., 2d Sess. 2–5, 11–15; reprinted in [1976] U.S.Code Cong. & Admin.News, pp. 6121, 6122–26, 6131–36; Davis, *Sovereign Immunity Must Go,* 22 Ad.L.Rev. 383, 403–05 (1970); Jacoby, *Roads to the Demise of the Doctrine of Sovereign Immunity,* 29 Ad.Law Rev. 265, 270–71 (1977). But what is important in the present case is that for injunctions and declaratory relief, the claimant against the Government must go to the district court and there sue officers; for money damages (always referring to damages in excess of $10,000), the plaintiff must go to the Court of Claims. Congress has thus reaffirmed that there is no consent to suits in district court for money damages in excess of $10,-000.[2]

The division of jurisdiction between the two courts requires that the courts be careful to reject Tucker Act claims masquerading as suits for injunctive or declaratory relief: *Warner v. Cox,* 487 F.2d 1301 (5th Cir. 1974) was such a suit. There a contractor brought suit against the Secretary of the Navy seeking a reversal of an administrative determination requiring the plaintiff to repay the Navy some $55 million paid by the Navy under a contract. The district court found for the plaintiff and entered an injunction restraining the Secretary from recouping the $55 million by refusing to make further payments on the contract. The Court of Appeals reversed,

finding the claim to be a suit against the United States within the exclusive jurisdiction of the Court of Claims under 28 U.S.C. § 1491.

Applying the test of *Land v. Dollar,* the court held that the judgment against the Secretary would expend "itself (with sensible impact) on the public treasury and [would compel] the government to pay money in advance of the time specified in its contract, money which it conceivably might never otherwise have to pay at all." 487 F.2d at 1303. In concluding that the then text of the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1970) could not be invoked as a grant of jurisdiction for such a suit (a forecast of the decision in *Califano v. Sanders, supra* ), the Court pointed out the necessity of guarding against allowing claims for money redressable in the Court of Claims to be rephrased as suits for equitable relief against Government officers (487 F.2d at 1306):

> Congress established the Court of Claims to determine claims of this type and magnitude but deliberately withheld equitable powers from it. Since the United States by reason of its nature acts only through agents, it is hard to conceive of a claim falling no matter how squarely within the Tucker Act which could not be urged to involve as well agency error subject to review under the APA. Little imagination is needed to foresee the consequences of a holding that such claims as this may be reviewed either in a court having power to grant equitable relief against the United States or in one having none. We refuse to believe that Congress intended, in enacting the APA, so to destroy the Court of Claims by implication.

In other cases, too, courts have emphasized that claims against the United States for money cannot be transformed into non-Tucker-Act claims for equitable relief merely by naming officers of the United States as defendants in place of the United States and praying for declaratory or other equita-

---

2. For the sake of simplicity, no mention is made of the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1976), or other waivers of sovereign immunity in areas such as admiralty.

ble relief.[3] In *Mathis v. Laird,* 483 F.2d 943 (9th Cir. 1973), relied on by the district court in sending the present case here, the Ninth Circuit readily found that a suit for back pay by a claimant who had been separated from the Air Force was within the exclusive jurisdiction of the Court of Claims, though the complaint was cast in terms of an action for mandamus and a declaratory judgment and the Secretary of Defense was the named defendant. See also *Carter v. Seamans,* 411 F.2d 767 (5th Cir. 1969), *cert. denied,* 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970).

Similarly, in *Myers v. United States,* 323 F.2d 580 (9th Cir. 1963), the court determined that a suit in the nature of inverse condemnation, within the exclusive jurisdiction of the Court of Claims, could not be converted into a suit for trespass, within the jurisdiction of a district court as a tort, simply by the plaintiffs' saying so. As the Court stated, "The repeated characterization by the appellants of the taking by the United States as one of trespass and the commission of waste upon the lands in question does not convert the claims to cases sounding in tort and thereby confer jurisdiction on the District Court under the Federal Tort Claims Act." 323 F.2d at 583.

The present suit by the Hoopa Valley Tribe is as much a suit against the United States for money as any of these cases. It is apparent from the face of the complaint that plaintiff seeks the payment of money. In the text of the count, plaintiff asks that "the sequestered proceeds be distributed to plaintiff forthwith" and that "the assets of plaintiff's trust which have been wrongfully taken" be restored; the prayer, less forthrightly, asks for a declaration that the defendants have no right to take said timber and proceeds therefrom from plaintiff at any time and for any reason. Count II asks for a judgment "mandating" the restoration of plaintiff's assets.

The relief sought would fall well within the test of *Land v. Dollar, supra,* as expending itself on the public treasury. The Secretary of the Interior sequestered 70 percent of the timber revenues in an attempt to comply with the decision of the Court in *Short.* Any judgment for the plaintiff on Counts I and II of the instant case would both "expend itself on the public treasury" and prevent the Secretary from obeying the final judgment of the Court of Claims as to who is entitled to money in the Treasury. The naming of Government officers as defendants and the prayers in Counts I and II for declaratory and injunctive relief are nothing but camouflage for a claim against the United States for money. That claim lies within the exclusive jurisdiction of the Court of Claims.

*Count III—Res Judicata and Jurisdiction*

Count III seeks relief alternative to Count I. Plaintiff argues that if it be declared that the Secretary's sequestration of part of the timber revenues is proper, then a different amount than 70 percent should have been sequestered. The correct percentage, it is said, should be based on the ratio, as of 1891, of the number of ancestors of the Hoopas who are members of the plaintiff Tribe to the number of ancestors of the total number of Indians who resided on the reservation "for whom defendants have now sequestered 70% of plaintiff's income." The complaint does not specify the ratio in 1891 but it is alleged to be more favorable to plaintiff Tribe than the 70–30 ratio, which "rewards procreation and denies equal protection of law."

Finally, plaintiff is content to have received 100 percent of the revenues until 1974—not the 1891 portion which it alleges is correct. The prayer is for a declaration that the 70–30 ratio be nullified and that the named defendants reallocate the formu-

---

**3.** Comparably the administrative jurisdiction to decide claims under contracts subject only to limited judicial review for error of law or lack of substantial evidence (41 U.S.C. §§ 321–22 (1976); *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966)) cannot be avoided by couching an administratively redressable claim as a claim for breach of contract. *Morrison-Knudsen Co. v. United States,* 345 F.2d 833, 70 Ct.Cl. 757 (1965); *L. W. Foster Sportswear Co. v. United States,* 405 F.2d 1285, 86 Ct.Cl. 499 (1969).

la for sequestration of timber income according to the 1891 ratio, "and that said allocation be made retroactive to June 25, 1974," when payment of 100 percent to the Hoopas ceased.

*Jurisdiction.* Count III seeks the distribution to the Tribe or its members of an unstated amount greater than the annual timber revenues now being distributed. If, as alleged in the complaint, a sequestration of 70 percent of revenues since 1974 has resulted in an accumulation of $10 million, then the remaining 30 percent, distributed to the Hoopas, amounted to $4,300,000 and the total or 100 percent of the revenues available was $14,300,000. Thus any increase in plaintiffs' share over the present 30 percent by even 1 percent to 31 percent would mean an additional payment to plaintiff of 1 percent of $14,300,000 or $143,000. The claim in Count III is thus seen to be one for payment to plaintiff, by Government officers, from the Treasury of the United States of a sum surely greater than $10,000, alleged to be owing to the plaintiff or its members. Such a claim is of course within the exclusive jurisdiction of the Court of Claims, for the reasons stated with respect to Counts I and II.

It is relevant here to note that, as a consequence of the court's jurisdiction of the suit heard in *Short,* the court had continuing jurisdiction over the amounts to be sequestered pending the final judgment, yet to come, as to which of the 3,800 plaintiffs are entitled to participate in the annual distribution of timber revenues. The administrative decision to suspend payments to the Hoopas of the entire revenues and to sequester 70 percent of the revenues for the possibly successful plaintiffs in *Short* was action taken to comply with this court's decision on title generally, pending final decision on how much is owing to the plaintiff Yuroks. That administrative decision, if erroneous, could be challenged in the proceedings in *Short* by any of the parties to the case, under the jurisdiction granted to the court in 1972 to remand matters to executive departments or officers with proper directions: "In any case within its jurisdiction, the court shall have the power

to remand appropriate matters to any administrative body or official with such direction as it may deem proper and just." 28 U.S.C. § 1491 (1973), *as amended by* Pub.L. 92–415, § 1, 86 Stat. 652.

The objective of the remand power is to provide a complete remedy. The deliberate Congressional purpose in enacting the remand statute was to make it unnecessary for the parties to go to another court, after the Court of Claims made its decision, to obtain the rights which follow from the decision. *See* S.Rep. No. 92–1066, 92d Cong. 2d Sess. (1972) 2, *reprinted in* [1972] U.S.Code Cong. & Admin.News, p. 3116; H.R.Rep. No. 92–1023, 92d Cong. 2d Sess. (1972) 3–4. So here, the remand power was available in this court and made it unnecessary for a party to *Short* to sue in a district court to challenge the decision to sequester 70 percent of the timber funds pending final decision. The Hoopa Valley Tribe, already a party to the *Short* case, could in this court have invoked the remand power to challenge the 70–30 percent ruling which it has challenged in the District Court in California. This further identity of the jurisdiction of this court with that which the Tribe sought to invoke by its suit in district court is additional confirmation of the exclusive jurisdiction of this court over Count III.

*Res Judicata.* Plaintiff is precluded by the doctrine of res judicata from seeking to raise the issues of the ratio of division of revenues between Hoopas and Yuroks, sought to be raised in Count III. In *Short* this court held that the rights in the timber revenues were the individual rights of the Indians of the Reservation; that all the revenues were to be divided by the number of Indians of the Reservation and that the resulting shares were to be those of the individual Indians, respectively. The court concluded that 22 named Indians were Indians of the Reservation. Since then, in orders dated December 3, 1976 and April 27, 1978, the court has granted summary judgment on behalf of 110 additional plaintiffs, adjudging them to be Indians of the Reservation entitled to per capita payments.

Each of these plaintiffs is entitled to one share of the total shares to be determined. And as already noted, proceedings are pending on motions for summary judgment that some 3,200 plaintiffs are qualified as Indians of the Reservation, and each entitled to a share.

The Hoopa Valley Tribe has been heard at length on these matters in the proceedings in *Short.* It could have urged that if it failed in its contention that the Hoopas were entitled to 100 percent of the timber revenues, then the division as between *Short* plaintiffs and the Hoopas should be, not by the number of individual Indians of the Reservation, including Yurok plaintiffs and Hoopas, but by some ratio of the two groups as of some date in the past. It chose not to so argue. Now, several years later, any effort so to reargue the issue—the division of shares between Yurok and Hoopas, per capita or in gross, as of the present or the past—contravenes the doctrine of res judicata. The claim, and the issue, have been determined, and relitigation is precluded.

The contention of an appropriate ratio as between Indians of the Square and Indians of areas added in 1891, also, renews the argument of the Tribe, rejected in *Short,* that the Addition and the Square are separate entities to be treated separately. *Short* decided that the reservation was a single, integrated reservation, all of whose inhabitants were to be treated equally and indistinguishably. While the idea of a ratio between the two groups as of 1891 was not mentioned in the briefing in *Short,* the issue of the division between Yuroks and Hoopas as occupants of separate areas was raised and rejected. It is now too late to relitigate the claim.

Count III, too, is to be dismissed, together with Counts I and II, as barred by the doctrine of res judicata.