Jessie SHORT, et al.

v.

The UNITED STATES, Defendant,

and

Hoopa Valley Tribe of Indians, Defendant-Intervenor.

No. 102–63.

United States Court of Claims.

Sept. 23, 1981.

Harold C. Faulkner, San Francisco, Cal., atty. of record, William C. Wunsch, Weyman I. Lundquist, San Francisco, Cal., and William K. Shearer, San Diego, Cal., for certain plaintiffs. Wallace A. Sheehan, Faulkner, Sheehan & Wunsch, and Heller, Ehrman, White & McAuliffe, San Francisco, Cal., of counsel.

Clifford L. Duke, Jr., San Diego, Cal., atty. of record for certain plaintiffs. Bryan R. Gerstel and William K. Shearer, Duke & Gerstel, San Diego, Cal., of counsel.

James E. Brookshire, Springfield, Va., with whom was Acting Asst. Atty. Gen. Anthony C. Liotta, Washington, D. C., for defendant. Duard R. Barnes, Dept. of the Interior, Washington, D. C., of counsel.

Jerry C. Straus, Washington, D. C., atty. of record for defendant-intervenor. Edward M. Fogarty, Jerry R. Goldstein, and James A. Michaels, Wilkinson, Cragun & Barker, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, DAVIS, Judge, SKELTON, Senior Judge, and NICHOLS, KUNZIG, BENNETT and SMITH, Judges, en banc.

ON REQUEST FOR REVIEW OF TRIAL JUDGE'S OPINIONS DENYING DEFENDANT'S MOTION TO SUBSTITUTE AND DEFENDANT–INTERVENOR'S MOTION TO DISMISS

FRIEDMAN, Chief Judge:

In this suit, some 3,800 individuals who claim to be Indians of the Hoopa Valley Indian Reservation in Northern California (the Reservation) seek to recover their shares in the income from the sale of Reservation timber that the government distributed exclusively to another group of Indians of the Reservation. In *Short v. United States*, 202 Ct.Cl. 870, 486 F.2d 561 (1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1981, 40 L.Ed.2d 313 (1974) (the 1973 decision), we held the government liable to qualified Indians of the Reservation who were entitled to but did not receive shares in this income, and we rendered judgment in favor of 22 individual plaintiffs who had proved their entitlement. We also permitted the Hoopa Valley Tribe, the group of Indians to whom the government theretofore had distributed the timber income exclusively, to intervene as a party defendant.

The case is now before us on requests for review by the United States and the Hoopa Valley Tribe (collectively, the defendants) of two decisions of Trial Judge Schwartz denying (i) the United States' motion to substitute for the plaintiffs as the real party in interest an entity called the Yurok Tribe, and (ii) the Hoopa Valley Tribe's motion to dismiss the suit on the ground that it involves nonjusticiable political questions. The government states that if its motion to substitute is denied, it then joins in the motion to dismiss. We agree with and affirm the trial judge's decisions.

I.

A. The facts relevant to the case's present posture, which we briefly review here, were the subject of extensive findings in our 1973 decision. *See* 202 Ct.Cl. at 885–987, 486 F.2d 561, *passim*.

The timber revenues at issue derive from unallotted, trust-status lands on a portion of the Reservation known as the Square. This is an area 12 miles square, which constituted the entire original Hoopa Valley Reservation when that reservation was established in 1864. Fdgs. 10–21, 202 Ct.Cl. at 888–99, 486 F.2d 561. An area contiguous to the Square, inhabited then as now

primarily by Yurok Indians and known as the Addition, was added to the Reservation in 1891. Fdgs. 33–34, 202 Ct.Cl. at 902–03, 486 F.2d 561.

In 1950, the Indians of the Square established an organization known as the Hoopa Valley Tribe (fdg. 145, 202 Ct.Cl. at 962, 486 F.2d 561), whose membership excludes the plaintiffs. Fdg. 143, 202 Ct.Cl. at 961, 486 F.2d 561. Beginning in 1955, the Secretary of the Interior, pursuant to requests by the Hoopa Valley Tribe's Business Council, distributed the revenues from the timber sales annually in per capita payments to the Indians on the official roll of the Hoopa Valley Tribe, to the exclusion of the Indians of the Addition. Fdgs. 171, 173, 202 Ct.Cl. at 971–72, 973, 486 F.2d 561. The Secretary took this action on the basis of an opinion of the Solicitor of the Department, 65 Dec. Dep't Int. 59 (1958), *reprinted in* 2 U.S. Department of the Interior, Opinions of Solicitor of the Department of The Interior Relating to Indian Affairs, 1917–1974, at 1814, that the Square and the Addition were separate reservations. Fdg. 174, 202 Ct.Cl. at 973, 486 F.2d 561. Between 1955 and February 1969, these payments totaled approximately $12,650,000. Fdg. 172, 202 Ct.Cl. at 972, 486 F.2d 561.

In 1963, the plaintiffs, each of whom claims to be an Indian of the Addition area of the Reservation, brought this suit against the United States, as trustee and administrator of the timber resources of the Reservation, seeking their shares of the revenues the government had distributed to individual Indians of the Reservation. Following a trial and after briefing and oral argument, we held in 1973 that the Secretary's treatment of the Square and the Addition as separate reservations in which the Indians of each had exclusive rights to the resources of their area was erroneous. 202 Ct.Cl. at 884–85, 486 F.2d at 567–68. Adopting the trial judge's opinion and detailed findings (202 Ct.Cl. at 872–73, 486 F.2d at 561), we held that the Square and the Addition together constituted a single reservation, that all the Indians of that Reservation were entitled to share in all of its revenues that were distributed to individual Indians (including the timber revenues from the Square), and that the plaintiffs who were Indians of the Reservation were entitled to recover the monies the government withheld from them. Fdgs. 188–89, 202 Ct.Cl. at 980–81, 486 F.2d 561.

We also ruled that 22 of 26 named individual plaintiffs, whose cases had been chosen as representative of the plaintiff group, *see* 202 Ct.Cl. at 874, 486 F.2d at 562, had established that they were Indians of the Reservation. 202 Ct.Cl. at 885, 486 F.2d at 568; fdgs. 191–217, 202 Ct.Cl. at 982–87, 486 F.2d 561. We held that these 22 plaintiffs "are entitled to recover, as Indians of the Hoopa Valley Reservation, an aliquot share in the revenues of the unallotted trust-status lands of the entire reservation . . . , the amount of recovery to be determined following trial of the claims of the remaining plaintiffs." Fdg. 217, 202 Ct.Cl. at 987, 486 F.2d 561. We remanded the case for a retrial of the claims of the four remaining representative plaintiffs and a determination of the rights of the remaining plaintiffs to recover. 202 Ct.Cl. at 873, 885, 987–88, 486 F.2d at 561, 568.

The Supreme Court denied petitions for certiorari filed by the Hoopa Valley Tribe and the United States. 416 U.S. 961, 94 S.Ct. 1981, 40 L.Ed.2d 313 (1974).

B. Since our 1973 decision, the parties and this court have taken a number of steps looking toward the determination and identification of the Indians of the Reservation who are entitled to recover.

In 1976, we permitted 515 additional persons to intervene as plaintiffs as of the time the suit was instituted, thus increasing the number of plaintiffs to approximately 3,800. We also closed the class. *Short v. United States*, 209 Ct.Cl. 777 (1976).

Each plaintiff then filled out a' life-history questionnaire developed and agreed upon by the parties. *See Hoopa Valley Tribe v. United States*, 219 Ct.Cl. 492, ——, 596 F.2d 435, 439 (1979). Between September 1976 and May 1977, at the behest of the trial judge, the parties filed successive cross-motions for summary judgment for and

against some 3,200 plaintiffs. We referred these motions to the trial judge for recommended decision. *Short v. United States*, 212 Ct.Cl. 522 (1976). With the consent of the defendants, we granted summary judgment for 121 additional plaintiffs whose status as Indians of the Reservation the defendants did not contest. *Short v. United States*, No. 102–63 (orders entered December 3, 1976, February 25, 1977, and April 27, 1978).

The trial judge has not issued any recommended decisions on the remaining cross-motions for summary judgment because of (i) protracted but unsuccessful efforts to settle the case and (ii) the filing of the motions before us.

## II.

### *The Motion to Substitute*

A. After efforts to settle this case failed, the trial judge in September 1978 reconvened proceedings on the pending summary judgment motions. Shortly before a scheduled status conference to determine the course of proceedings, the government began efforts to organize a Yurok Tribe.

In November 1978, 15 days before the status conference, the Assistant Secretary for Indian Affairs of the Department of the Interior issued a letter to the plaintiffs in this case and to all members of the Hoopa Valley Tribe announcing a plan to organize a Yurok Tribe as the "first step" for "resolv[ing] the dispute over the use and benefit of the Hoopa Valley Reservation and remov[ing] the impediments to self-determination" on the Reservation.

The Assistant Secretary stated that he intended to conform to this court's 1973 decision by "designat[ing] the Hoopa Valley Tribe and the Yurok Tribe as the Indians of the Reservation who are entitled to use and benefit from the Reservation and its resources." Since no Yurok tribal organization existed and the membership of the Tribe was not established, the Assistant Secretary announced that the Interior Department would initiate organization of a Yurok Tribe.

In December 1978 and March 1979, the Interior Department proposed a set of qualifications for developing a list of persons entitled to vote in the election of an "Interim Yurok Governing Committee" that would draw up a tribal constitution for submission to the voters. 44 Fed.Reg. 12,-210 (1979); 43 Fed.Reg. 60,670 (1978). In May 1979, the Department proposed rules for the conduct of this election. 44 Fed. Reg. 31,156 (1979). These proposals engendered considerable opposition by the potential voters. In written comments and at government-sponsored public meetings held on or near the Reservation, they objected to organizing a tribe at all before conclusion of this lawsuit. In spite of these objections, in April and August 1979, the Interior Department published final regulations establishing qualifications for voters, 44 Fed.Reg. 24,536 (1979), and procedures for conducting the election. 44 Fed.Reg. 46,269 (1979). *See* 25 C.F.R. Parts 55, 55a (1980). The Interior Department then circulated nominating petitions and mailed out ballots.

Some of the plaintiffs in this action brought suit against the Secretary of the Interior to enjoin the election. The case was dismissed without prejudice upon the government's agreement not to conduct any election of a temporary or permanent governing body, a constitution drafting committee, or any other body purporting to be representative of the voters, "without first conducting a referendum in accordance with law in which the voters approve of such an election taking place." *Beaver v. Secretary of the Interior*, Civ.No. 79–2925 (N.D.Cal., Feb. 11, 1980).

In the ensuing referendum in which the Indians were asked to state whether they favored "establishment of an Interim Yurok Governing Committee," 1,909 voted against it and 65 in favor. All the plaintiffs were eligible to vote in that referendum. *See* 45 Fed.Reg. 49,224 (1980) (to be codified in 25 C.F.R. Part 55b).

B. In May 1979, while the government's efforts to organize a Yurok Tribe were pending, the United States filed a motion to

substitute the Yurok Tribe for the 3,800 individual plaintiffs. The theory of this motion is that the Reservation and its resources are tribal property rather than the common property of the individual Indians and that only a tribe composed of non-Hoopa Indians and not any individual Indian has a right to recover the proceeds of the timber sales. The defendant recognizes that there is no existing organizational or functional tribal entity. It urges, however, that the Yurok Tribe has existed for many years as a conceptual entity and suggests that if the motion to substitute is granted, the individual Yurok Indians soon will create an appropriate tribal organization.

The trial judge denied the motion primarily on the ground that all of the issues it raises have been rejected repeatedly during this litigation—and particularly in our 1973 decision.

C. The government argues that substitution of the Yurok Tribe for the individual plaintiffs would not be inconsistent with our 1973 decision because that decision did not determine that any individual Indian could recover, but only that the Square and the Addition are parts of a single reservation, the resources of which the government must use for the common benefit of the Indians of the tribes settled there.

To the contrary, our 1973 decision firmly and unequivocally held that individual Indians are entitled to recover. We explicitly stated that "[s]uch of the plaintiffs as are found herein to be Indians of the reservation will become entitled to share in the income from the entire reservation including the Square...." Fdg. 189, 202 Ct.Cl. at 981, 486 F.2d 561. We granted summary judgment for the 22 plaintiffs whom trial had shown to be Indians of the Reservation, ruling that they "are entitled to recover in amounts to be determined under Rule 131(c)...." 202 Ct.Cl. at 873, 486 F.2d at 561; see 202 Ct.Cl. at 885, 486 F.2d at 568; fdg. 217, 202 Ct.Cl. at 987, 486 F.2d 561. We reaffirmed that holding when we subsequently granted summary judgment for the 121 additional plaintiffs whose status as Indians of the Reservation the government

did not challenge. *See supra*, pp. 152–153.

■■ D. Our 1973 decision that the individual Indians are entitled to recover is the law of the case. As we explained in *United States v. Turtle Mountain Band of Chippewa Indians*, 222 Ct.Cl. ——, 612 F.2d 517 (1979), *quoted with approval in Northern Helex Co. v. United States*, 225 Ct.Cl. ——, ——, 634 F.2d 557, 561 (1980), under that doctrine "as a matter of sound judicial practice, a court generally adheres to a decision in a prior appeal in the same case unless one of three 'exceptional circumstances' exists: 'the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and works a manifest injustice.' " 222 Ct.Cl. at ——, 612 F.2d at 521. The government argues that we should not follow our 1973 decision because it comes within the last exception.

As we pointed out in *Northern Helex, supra*, 225 Ct.Cl. at ——, 634 F.2d at 562, however:

The standard under this exception is a stringent one. As we stated in *Turtle Mountain Band*: "The purpose of the law-of-the-case principle is to provide finality to judicial decisions. A strong showing of clear error therefore is required before a court should reexamine its decision in the prior appeal." 222 Ct.Cl. at ——, 612 F.2d at 521. A mere suspicion of error, no matter how well supported, does not warrant reopening an already decided point. *See id.* Only if we were convinced to a certainty that our prior decision was incorrect would we be warranted in now reexamining [it].

The government has not made a "strong showing of clear error" in our 1973 decision or "convinced [us] to a certainty" that it was wrong. We therefore decline to reconsider it. Indeed, to the extent that we have reexamined the 1973 decision in reaching this conclusion, we are satisfied that that decision was correct.

In our 1973 decision, we found that the effect of the 1891 Executive Order combining the Square and the Addition "was to create an enlarged reservation in which the Indians of the original reservation and the Indians of the added tracts would have equal rights in common" (fdg. 183, 202 Ct.Cl. at 976, 486 F.2d 561), and that "the effect of the executive order of 1891 was that all the Indians of the reservation as thereby extended—Addition and Square—got equal rights in the enlarged reservation . . . ." Fdg. 188, 202 Ct.Cl. at 980, 486 F.2d 561. Our ultimate finding was that the government "acted arbitrarily in recognizing only the persons on the official roll of the Hoopa Valley Tribe, whose rules exclude from membership most of the Indians of the Addition, as the persons entitled to the income from the unallotted trust-status lands on the Square." Fdg. 189, 202 Ct.Cl. at 980–81, 486 F.2d 561. It follows from that conclusion that individuals whom the Secretary arbitrarily excluded from *per capita* distributions have the right to recover.

Thus, as the trial judge pointed out in his opinion on the political question issue, "this is a case in which claimants are seeking the vindication of individual Indian rights" (Trial Judge's report at 17), not of tribal rights. Indeed, despite the existence of the Hoopa Valley tribal organization, the Secretary "disbursed" from the timber receipts "per capita payments to the Indians on the official roll of the Hoopa Valley Tribe . . . ." Fdg. 171, 202 Ct.Cl. at 971, 486 F.2d 561. The Secretary thus recognized that payment of the timber revenues on an individual (rather than a tribal) basis was an appropriate method of distribution, and was not in conflict with any concept of tribal ownership of trust-status lands.

Unlike the Hoopa Valley Indians, who had a tribal organization, there was no functioning entity that could have acted for the non-Hoopa Indians of the Reservation either when non-Hoopa Indians filed this suit in 1963, or when we ruled in 1973 that all the Reservation Indians had an interest in all the Reservation property. It was therefore not only appropriate, but necessary, that the present suit be brought by individual Indians.

In sum, the government has not demonstrated any error, let alone clear error, in our 1973 decision that the individual non-Hoopa Valley Indians of the Reservation are entitled to share in the revenues derived from the sale of timber on the Square.

E. The government also urges that substituting the Yurok Tribe for the individual plaintiffs would facilitate the disposition of this case. Assuming, *arguendo*, that this is a valid reason for departing from the law of the case (a highly dubious assumption), the argument is unconvincing.

The government asserts that the substituted Yurok Tribe could continue to prosecute this suit to a quick conclusion and that the money judgment in favor of the Tribe would be distributed, pursuant to the Indian Judgment Funds Distribution Act, 25 U.S.C. §§ 1401, *et seq.*, according to a plan to be formulated by the Secretary of the Interior and supervised by Congress. The government recognizes, however, that there is no functioning Yurok tribal organization. As noted, the Yuroks overwhelmingly rejected the government's attempt to organize a tribe. *See supra*, pp. 153–154. The problems that substitution of such a non-functioning entity for the present plaintiffs would create suggest that the more probable effect of the government's proposal would be to delay further rather than to expedite the ultimate disposition of this case.

How would a Yurok Tribe without any functional organization and without tribal leadership conduct the litigation? Who would represent it? Would the tribe retain the lawyers who represent the plaintiffs? Perhaps, but perhaps not. The chaotic situation that the government's proposal would be likely to produce is reminiscent of the government's uncertainty that prompted it earlier in this litigation to insist that all the individual claimants be identified and made parties rather than permitting the suit to proceed in a representative capacity. *See* pretrial conference memorandum of May

31, 1966. Since there is no way of knowing whether the plaintiffs would accept the government's suggested form of tribal organization, what other form that organization might take, or how long such organization might require, substitution hardly seems a promising method of expediting this litigation.

Moreover, the substitution of the Yurok Tribe as the plaintiff would not avoid the need for this court to ascertain who were the Indians of the Addition when the timber proceeds were distributed. Accomplishing the latter objective would require us to overrule a further portion of our 1973 decision and a 1979 decision.

In 1973, we held that each of the Indians of the Reservation was "entitled to share . . . equally with all other such Indians" in the proceeds of the timber sales distributed to individual Indians. Fdg. 189, 202 Ct.Cl. at 981, 486 F.2d 561. Several years later, the Hoopa Valley Tribe sought to prevent the government from sequestering 70 percent of the annual timber income pending the final decision in this case, contending that the Indians of the Reservation were entitled to timber revenues "based on [the] respective [population] share of each group in 1891" which was "approximately equal."

We held that the Hoopa Valley Tribe was barred by *res judicata* "from seeking to raise the issues of the ratio of division of revenues between Hoopas and Yuroks . . . ." *Hoopa Valley Tribe v. United States*, 219 Ct.Cl. 492, ——, 596 F.2d 435, 447 (1979). We stated that our 1973 decision held that "all the revenues were to be divided by the number of Indians of the Reservation and that the resulting shares were to be those of the individual Indians, respectively." *Id.* at ——, 596 F.2d at 447.

The defendants have not demonstrated that those rulings were erroneous, and we decline to reconsider or change them. The Hoopa Valley Tribe's present contention that the timber sale revenues should be divided 50–50 between the Hoopa Valley and the Yurok Tribes as tenants-in-common does not warrant a change in our previous decisions that those revenues are to be divided per capita among all the Indians of the Reservation.

### III.

### *The Motion to Dismiss*

■ The Hoopa Valley Tribe has moved to dismiss all the individual claims on the ground that they involve nonjusticiable "political" questions. The United States joins in the motion if, as we have done, we reject its motion to substitute. The defendants contend that, under *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), there are no "judicially discoverable and manageable standards"—one of the indicia of a political question—for us to apply in determining who are Indians of the Reservation. Therefore, the argument runs, it is for Congress and the Executive branch, but not for the courts, to make that determination.

In denying the motion, the trial judge correctly pointed out that its substance, although not in its precise present form, had been urged upon us several times in this case, that we have rejected the contention repeatedly, and that the defendants have given no convincing reasons why we should now reach a different conclusion. The trial judge also correctly noted that if the motion raises a new issue, the defendants have not given an adequate explanation for their 17-year delay in filing it. Finally, the trial judge discussed at considerable length the merits of the contention and found them unpersuasive. Although we agree with the trial judge's opinion, we find it necessary to discuss only his first ground of decision, since, in our view, that is dispositive.

As the trial judge pointed out, this is not a new contention. In a motion to dismiss filed in 1963, the government argued that the task of identifying the individuals entitled to share in the timber income was "subject to the plenary power of Congress and . . . not a judicial matter." We denied the motion to dismiss the entire case, but granted it with respect to two of the plaintiffs' claims, which are irrelevant to the case in its present status. *Short v. United*

*States*, No. 102–63 (order entered April 24, 1964).

In a joint brief submitted in the 1973 case, the defendants asserted that "the power to determine membership in a tribal entity for the purpose of resolving entitlement to tribal property resides squarely with Congress, or with the tribe, subject to the approval of the Secretary of the Interior." In their exceptions to the trial judge's recommended findings there that 22 specific individual plaintiffs had proved that they were Indians of the Reservation, the defendants stated that, in his recommended decision, the trial judge had "been unable to propose reasonable standards" for determining which of the plaintiffs were entitled to judgments, and urged that "such complex determinations are reserved for administrative officials, such as the Secretary of the Interior . . . ." This contention is virtually identical to the one the defendants now make. In holding that the 22 plaintiffs were entitled to recover, our 1973 decision necessarily rejected that contention.

The Hoopa Valley Tribe asserts that those earlier arguments were directed only to the question of jurisdiction over the subject matter of this suit, but not to its nonjusticiability. The government's petition for certiorari seeking review of our 1973 decision, however, recognized that that decision rejected the assertion that the case was nonjusticiable. Citing *Baker v. Carr, supra,* the leading decision on the political question doctrine, the petition contended that our 1973 decision "unduly interferes with the authority of the political branches of the government to recognize tribal membership and tribal jurisdiction," which are "question[s] of judgment for the political branches to decide. . . ."

Although there are significant doctrinal differences between jurisdiction and justiciability, the arguments the defendants now make in support of dismissal for nonjusticiability are the same ones they previously made in support of dismissal for lack of jurisdiction. Both arguments essentially are that this case requires the decision of questions within the exclusive province of the political branches of the government. Our prior decisions rejecting those contentions are the law of the case. Here, as in the motion to substitute, the defendants have not shown that our prior decisions were clearly erroneous or, indeed, erroneous at all. To the extent that the defendants argue that the problems that have developed in formulating guidelines for determining who are Indians of the Reservation demonstrate the error of those prior decisions, our discussion in part IV of this opinion (*infra,* pp. 157–159) of the appropriate guidelines shows that there are "judicially discoverable and manageable standards" for deciding this case.

### IV.

*The Further Proceedings in This Case*

This suit was begun in 1963 and, except for cases transferred to us from the Indian Claims Commission, it is the oldest case on our docket. The trial judge has been struggling valiantly, vigorously, and conscientiously for more than seven years to formulate standards for determining who are Indians of the Reservation. Substantial progress has been made, including the filing of detailed personal questionnaires and of voluminous motions for summary judgment with respect to most of the plaintiffs. Unfortunately, the proceedings have been seriously delayed for a number of reasons; over which the trial judge had no control, including the present motions, which have been pending for more than two years.

In his opinion dealing with the political question issue, the trial judge stated that the issue of the standard for identifying Indians of the Reservation is "both difficult and novel" (Trial Judge's report at 18), and that "[a]mong the pending matters" on the motions for summary judgment is the question of utilizing "such sources of assistance to the court as the employment of a court-appointed expert and invitations to appropriate organizations to appear as amici curiae on the issue of the appropriate qualifications for an Indian of the reservation." (Trial Judge's report at 19). Those procedures would further delay the case and we see no need to utilize them.

Under our order referring the motions for summary judgment to the trial judge, he ordinarily would initially formulate the standard for determining the Indians of the Reservation. We have determined, however, that in order to expedite this case, we should now ourselves undertake the task. In doing so, fortunately we need not write upon a clean slate.

The timber revenues that the Secretary distributed to individual Hoopa Indians beginning in 1955 were paid to those persons whom the Hoopa Business Council had determined to be members of the Tribe. In our 1973 decision, we found that the Hoopa Business Council in 1948 undertook to compile "a current roll of the Indians of . . . the Square, for the purpose of controlling the revenues from the resources of the reservation as so defined." Fdg. 136, 202 Ct.Cl. at 959, 486 F.2d 561. In determining the membership of the Hoopa Tribe (to whom the Secretary made the payments), the Hoopa Business Council used a detailed and carefully drawn set of standards. We described and explained those standards in the findings in our 1973 decisions. Fdgs. 137–45, 148, 152(c), 155–56, 202 Ct.Cl. at 959–67, 486 F.2d 561. The Secretary approved both the Hoopa constitution (which specified the standards for membership in the Hoopa Valley Tribe, fdg. 145, 202 Ct.Cl. at 962, 486 F.2d 561) and two schedules which listed most of the Indians who had been determined to be members of the Tribe. Fdg. 153, 202 Ct.Cl. at 964, 486 F.2d 561.

Although the situation of the Hoopas and the plaintiff Yuroks may not be precisely the same, we conclude that the standards used to determine the membership of the Hoopa Valley Tribe also provide an appropriate basis for determining which of the plaintiffs are Indians of the Reservation. The timber revenue payments were made to those Hoopas who, on the basis of those standards, had been determined to be Indians of the Reservation as the Secretary then viewed that area, i. e., solely the Square. We held in 1973 that "Indians of the Reservation" were not limited to those of the Square, but also included those of the Addition. The bases that originally were used to determine the Indians of that portion of the Reservation, and which the Secretary of the Interior used in his decision on how to distribute the timber profits for the benefit of the Indians of the Reservation, are no less appropriate to determine the additional persons whom we have held are also Indians of the Reservation.

Indeed, the Interior Department recognized this fact when it attempted to organize a Yurok Tribe. In his message to the Hoopas and Yuroks proposing the organization plan (see supra p. 153), the Assistant Secretary for Indian Affairs stated that the Yurok's "membership standards and criteria" should "[t]o the extent possible . . . be constructed along lines similar to those used during the construction of the membership of the Hoopa Valley Tribe. . . ." See 44 Fed.Reg. 12,210 (1979). The Assistant Secretary suggested not only that the Yurok membership roll would be developed according to procedures similar to those used by the Hoopa Valley Tribe, but that similar membership standards would result. He anticipated, for example, "that members of both Tribes will include some Indian people who are not necessarily of Hoopa or Yurok blood."

In any case such as this, where it is necessary to formulate standards for determining the membership of a large class, probably it is impossible to achieve workable and manageable criteria that can be easily applied and that also will produce the correct result in every situation. There is need for some flexibility, so that recognition can be given to the small number of cases in which the standards cannot be strictly applied or in which their strict application would produce manifest injustice. Moreover, there may be differences between the situations of the Hoopas and the Yuroks that necessitate some differences in the standards governing the membership of the two Tribes.

The Hoopa Tribe standards, however, provide an appropriate guideline and basis for determining which of the plaintiffs are entitled to share in the timber payments

because they are Indians of the Reservation. Those are the standards the trial judge basically should apply in deciding the question. We leave it to the trial judge's sound discretion to determine what, if any, changes should be made in the Hoopa standards and in the application of the governing standards in individual cases. We have every confidence that the trial judge, with his long experience and complete familiarity with this case, will be able to formulate and apply those standards to produce a just and fair result.

The task the trial judge must perform upon the remand we are ordering will be difficult and time-consuming. We believe, however, that within six months he should be able to render a recommended decision that in a single document will announce the governing standards and apply them to those of the plaintiffs' cases that are ripe for decision. We take comfort from the statements by the plaintiffs' counsel at oral argument that the Hoopa standards would be appropriate to apply in this case and that their use would permit a prompt completion of this litigation.

## CONCLUSION

The decisions of the trial judge denying the motions of the defendant to substitute the Yurok Tribe for the individual plaintiffs and of the defendant-intervenor to dismiss the suit are affirmed, and those motions are denied. The case is remanded to the trial judge to issue by April 1, 1982, a recommended decision determining, under standards he will formulate in accordance with this opinion, which of the plaintiffs whose cases are ready for disposition are Indians of the Reservation.