Jessie SHORT, et al., Plaintiffs,

v.

The UNITED STATES, Defendant,

and

The Hoopa Valley Tribe of Indians, Defendant-Intervenor.

Charlene ACKLEY, et al., Plaintiffs,

v.

The UNITED STATES, Defendant,

and

The Hoopa Valley Tribe of Indians, Defendant-Intervenor.

Nos. 102–63, 460–78.

United States Claims Court.

March 17, 1987.

---

**8.** The court does not rule on the sovereign acts    defense at this time.

William C. Wunsch, San Francisco, Cal., and Clifford L. Duke, Jr. and William K. Shearer, San Diego, Cal., for plaintiffs in the Short case.

Francis B. Mathews, Eureka, Cal., for plaintiffs in the Ackley case.

James E. Brookshire, Edward J. Passarelli and Pamela S. West, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht II, for defendant.

Thomas P. Schlosser, Seattle, Wash., for The Hoopa Valley Tribe of Indians.

## OPINION

MARGOLIS, Judge.

On December 5, 1985, this court ruled from the bench on the measure of damages to be awarded in this case, reserving the right to supplement its ruling with a written opinion. The court subsequently requested briefing on whether monies distrib-

uted to individual Hoopa Indians after 1974 should be included in the damages determination, and now concludes that the post–1974 distributions did injure plaintiffs. To the extent this written opinion adds to or differs from the December 5, 1985 bench ruling, that ruling is hereby superseded and modified.

## BACKGROUND

This case, filed in the United States Court of Claims on March 27, 1963, has outlasted some 400 now deceased plaintiffs, the original trial judge, several deceased attorneys, and even the court in which it originally was filed. Presently at issue is the nature and extent of the damage award. The liability of the defendant United States is established. *Jessie Short, et al., v. United States*, 202 Ct.Cl. 870, 884, 486 F.2d 561, 568 (1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1981, 40 L.Ed.2d 313 (1974) (*Short I*). In 1981, the court directed the trial judge to develop standards to determine which plaintiffs were "Indians of the Reservation" entitled to recover. *Jessie Short, et al. v. United States*, 228 Ct.Cl. 535, 550–51, 661 F.2d 150, 158–59 (1981), *cert. denied*, 455 U.S. 1034, 102 S.Ct. 1738, 72 L.Ed.2d 153 (1982) (*Short II*). In 1983, those standards were affirmed, *Jessie Short, et al. v. United States*, 719 F.2d 1133, 1143 (Fed.Cir.1983), *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3545, 82 L.Ed.2d 849 (1984) (*Short III*), and the case-by-case qualification of the 3,800 individual plaintiffs, under those standards, is currently underway.

In 1973, the Court of Claims determined that the Hoopa Valley Reservation (Reservation) in northern California was a single unit and that income derived from the unallotted lands on one portion of the Reservation known as the "Square" could not be distributed only to Indians on the official roll of the Hoopa Valley Tribe (Tribe). Fndgs. 188–89, *Short I*, 202 Ct.Cl. at 980–81, 486 F.2d 561. The Hoopa Valley Tribe was organized as an entity in 1950 and its membership includes most of the ethnological Indian tribes and groups who traditionally occupied the "Square." In *Short I*, the court held that the plaintiffs, mostly Yurok

Indians living on another portion of the Reservation known as the "Extension" or "Addition," should have participated in per capita distributions made by the Secretary of the Interior (Secretary). All "Indians of the Reservation" were held entitled to receive payments, and the discriminatory distributions of the proceeds of the timber sales (and other Reservation income) constituted a breach of the government's fiduciary duties with respect to the qualified plaintiffs. *Short III*, 719 F.2d at 1135. Although this opinion deals primarily with the timber revenues, the principles enunciated herein generally apply to the other Reservation income as well.

The Secretary first began to distribute proceeds derived from the unallotted trust lands of the Square exclusively to Hoopa Valley Tribe members in 1955. Monies, consisting of revenues and earned interest, were paid per capita to individual Indians on the Tribe's official roll, and were also paid to the Hoopa Valley Tribe (as a government) for the purpose of developing or maintaining services for the Reservation. The plaintiffs did not receive any per capita distributions, nor were any payments made to a Yurok tribal government, as the Yuroks were not formally organized. To date, efforts to organize a Yurok tribal government have been unsuccessful, largely because of this case. *See Short II*, 228 Ct.Cl. at 540, 661 F.2d at 153.

Following the liability decision in *Short I*, the Bureau of Indian Affairs restricted the distributions made to the Hoopa Valley Tribe to only thirty percent (30%) of the unallotted Reservation income. The thirty percent figure was selected because the number of Hoopa tribal members, when compared with the number of *Short* plaintiffs in 1974, represented about 30% of the total number of potential "Indians of the Reservation." *Hoopa Valley Tribe v. United States*, 219 Ct.Cl. 492, 502–03, 596 F.2d 435, 440 (1979). However, additional per capita payments were made to the plaintiffs' exclusion after 1974 when the Secretary released these funds to the Hoopa Valley Tribe.

On six separate occasions commencing on August 6, 1974 and ending on March 7, 1980, per capita payments amounting to some $5,293,975 were made to individual Hoopa Indians on the official roll of the Hoopa Valley Tribe, with the knowledge, acquiescence or cooperation of the Secretary. The remaining seventy percent (70%) of the funds has been held in trust by the Secretary in "Indian Monies, Proceeds of Labor" accounts (IMPL accounts), pending resolution of this case. These accumulated monies, sometimes referred to as the *Short* escrow fund, now total over $60,000,000 and remain in the United States Treasury, accumulating interest pursuant to statute.

The plaintiffs seek a share of what the Hoopas received directly through per capita payments and indirectly through monies paid to the Hoopa Valley Tribe as a government. Under the plaintiffs' theory, the monies paid to the Tribe would be prorated among the Tribe's membership, and each plaintiff would receive an amount equal to one prorated share. Monies spent by the Tribe to preserve the timber lands and other governmental services that benefited the entire Reservation would be offset against the plaintiffs' award. The plaintiffs also seek interest on the award and the balance of the escrow fund, arguing that these accumulated monies represent their exclusive share of the Reservation resources collected after 1974.

The defendant, United States, and the defendant-intervenor, Hoopa Valley Tribe of Indians, insist that, as individuals, the plaintiffs have no rights to monies distributed to the Tribe for communal purposes. Defendants argue that the law of this case mandates that the award be based on what the plaintiffs would have received had the Secretary not unfairly limited the class of beneficiaries receiving per capita payments. Defendants further argue that monies held by the Secretary in the escrow fund are communal or tribal in nature, and this court lacks jurisdiction to award damages from this fund. The government and the Tribe assert that plaintiffs, as individuals, have no rights in communal revenues derived from unallotted lands until such

revenues are individualized through per capita payments.

In addition, the defendant argues that per capita distributions made after 1974 should not be included in the damage award. The government reasons that since the Secretary retains control of the escrow fund and could decide to distribute shares of the fund to the plaintiffs in the future, an award at this time would be premature. With respect to interest, the defendant argues that the government has not waived its sovereign immunity and that interest, therefore, cannot be assessed. The defendant-intervenor disagrees with the defendant in one respect. The Tribe argues that post–1974 per capita distributions to its members *did* injure the plaintiffs, and they should now be compensated for these post–1974 breaches of trust.

The court has considered the briefs filed by the parties regarding the post–1974 distributions, reconsidered the extensive briefs filed on the issue of damages generally, and reviewed the oral arguments presented.

## DISCUSSION

■ To the extent that prior opinions in this case specifically address the issue of damages, those opinions emphasize the individual nature of the plaintiffs' claims and indicate that recovery is limited to participation as individuals in per capita distributions. As was stated by the U.S. Court of Claims:

> [a]dopting the trial judge's opinion, ... [in 1973] we held that the Square and the Addition together constituted a single reservation, that all the Indians of that Reservation were entitled to share in all of its revenues *that were distributed to individual Indians* (including the timber revenues from the Square), and that the plaintiffs who were Indians of the Reservation were entitled to recover the monies the government withheld from them.

*Short II*, 228 Ct.Cl. at 538, 661 F.2d at 152 (emphasis added). Elsewhere the court stated, "[i]t follows ... that individuals whom the Secretary arbitrarily excluded from *per capita* distributions have the

right to recover." *Id.* at 543, 661 F.2d at 155.

The Federal Circuit's affirmation of the trial judge's 1982 opinion establishing the eligibility standards, and the prior *Short I* and *Short II* opinions, clearly characterized the plaintiffs' claim as one for breaches of trust based upon discriminatory distributions of unallotted Reservation revenues. This lawsuit is a claim for money damages, not one to partition or individualize the unallotted common lands and resources of the Reservation. Unallotted lands, by their very definition, are not individual in nature, but rather are held in common for Indian tribes, nations, bands, or communities. Similarly, the revenues from unallotted lands are communal or tribal in nature until they are individualized. Breaking up or allotting communal or tribal resources to individual Indians was once federal policy; however, that policy is now disfavored. *See* 25 U.S.C. § 461 (1982); Felix S. Cohen's Handbook of Federal Indian Law, 136–144, 170–75 (R. Strickland ed. 1982).

The unique situation on the Hoopa Valley Reservation, where the only formally organized tribal government includes only a fraction of the Indians for whom the Reservation was established, required the approach taken by the Court of Claims in its 1973 ruling and subsequent decisions. Faced with the unusual situation of no organized Yurok tribal government with an existing tribal roll to determine which plaintiffs were unjustly excluded, the court adopted approximations of the Hoopa Valley Tribe's enrollment standards to identify the "Indians of the Reservation" who the Secretary should have included in the per capita distributions.

In discussing the eligibility standards, Trial Judge Schwartz, who wrote the 1973 liability opinion, concluded that:

> [i]n the present circumstances of per capita distributions already made to fewer than those entitled, it is therefore sensible and equitable to define the group improperly deprived of payments by the same definitions as identified those who received payments, less the factors wrongfully used to exclude the claimants from the distributions.

*Short v. United States,* No. 102–63, slip. op. at 28 (Ct.Cl. March 31, 1982). The law of the case therefore mandates that the *individual* qualified "Indians of the Reservation" be included in any per capita distributions made in the years until final judgment, and for the years to come while the situation on the Reservation remains the same. *Short III,* 719 F.2d at 1143.

It should be clearly understood that this court is not determining which individuals are members of a "Yurok Tribe" through the qualification process. The decision regarding tribal citizenship or membership is an essential attribute of Indian self-government and rests with the Indian tribe or nation concerned, not this court. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 72 n. 32, 98 S.Ct. 1670, 1684 n. 32, 56 L.Ed.2d 106 (1978). Nor is this court determining the extent of jurisdiction or the nature of rights that an organized "Yurok Tribe" might have in the unallotted trust-status lands of the Hoopa Valley Reservation. *See Lillian Blake Puzz, et al. v. U.S. Department of the Interior,* No. C80–2908 TEH, slip op. at 14–15 (N.D.Cal. Oct. 2, 1984). This action is one by individual Indians of the Hoopa Valley Reservation for a breach of trust that will compensate them for monies they would have received had the per capita distributions been made in a non-discriminatory manner.

As stated in the original liability opinion:

> [s]uch of the plaintiffs as are found herein to be Indians of the reservation will become entitled to share in the income from the entire reservation, including the Square, equally with all other such Indians, including the Indians of the Square.

Fndg. 189, *Short I,* 202 Ct.Cl. at 981, 486 F.2d 561. Therefore, a qualified plaintiff holds individual rights as an Indian of the Reservation equal to that of an enrolled Hoopa Valley Tribe member. Tribal or communal assets that have not been individualized may not be awarded since plaintiffs are suing as individuals under 28 U.S.C. § 1491 (1982).

### A. *Per Capita Distributions Prior to 1974*

Both the defendant and the defendant-intervenor concede that the qualified *Short* plaintiffs are entitled to compensation for per capita distributions made six years prior to the filing of suit on March 27, 1963. Qualified *Ackley* plaintiffs may recover only for distributions made six years prior to the filing of their suit on October 20, 1978. From March 27, 1957 to June 30, 1974, $23,811,963.75 in tribal or communal monies was distributed per capita to the Tribe's individual members. However, the defendant and the defendant-intervenor disagree with the plaintiffs on how that compensation should be measured. The plaintiffs assert that they are entitled to receive what each Hoopa Valley tribal member received through per capita payments on a dollar-for-dollar basis. The defendants argue that the plaintiffs were damaged only to the extent that they failed to receive the funds they would have received, had the Secretary properly distributed the money.

The proper measure of damages to qualified plaintiffs will be the share they would have received had the distributions been made in a non-discriminatory manner. *See* Restatement (Second) of Trusts § 205 comment a (1959). Therefore, each qualified plaintiff alive at a given date of distribution will receive a share equal to the total amount of money distributed per capita (principal and interest), divided by the total number of eligible "Indians of the Reservation" who received, or should have received, a payment according to the formula as shown:

$$\frac{\text{total amount of money distributed per capita}}{\text{Hoopas who received payments + qualified plaintiffs}}$$

The total money recovery for each qualified plaintiff will be the sum of the amounts to which he or she is entitled for each per capita distribution, plus interest from the date of distribution as discussed in section D of this opinion.

### B. *Per Capita Distributions After 1974*

▮ The defendant's argument that per capita distributions made after 1974 did not injure plaintiffs is without merit. The mere possibility that the Secretary could award funds at some future date, equal to what individual Hoopas received and plaintiffs should have received, does not affect this court's present ability to grant relief. As determined in 1973, plaintiffs were entitled to participate in per capita distributions from Reservation proceeds. Fndgs. 188–89, *Short I*, 202 Cl.Ct. at 980–81, 486 F.2d 561. Per capita distributions were made before and after 1974, but the plaintiffs were denied participation. Hence, they are entitled to recover.

It is also without consequence that the monies were first distributed by the Secretary to the Hoopa Valley Tribe for subsequent distribution to the Tribe's individual members. Where the Secretary's action or failure to act permits a violation of his fiduciary obligations to occur, the United States is liable for the damages sustained. *United States v. Mitchell*, 463 U.S. 206, 226–28, 103 S.Ct. 2961, 2972–73, 77 L.Ed.2d 580 (1983) (*Mitchell II*). Per capita distributions made after 1974 will be accounted for in the damage award in the manner indicated above. The Secretary cannot avoid established trust obligations to qualified plaintiffs by making discriminatory distributions to individual Hoopas through the Hoopa Valley Tribe, when such distributions were otherwise prohibited by the law of this case.

### C. *Distributions to the Tribe*

The Secretary of the Interior, vested with certain discretionary powers over the management of unallotted Indian resources, decides when and how distributions of timber revenues from unallotted lands are to be made under 25 U.S.C. § 407 (1982). The Secretary's decision to provide necessary funds from unallotted lands to a tribal government, rather than to individuals, should be accorded some deference. These funds can be used to support tribal sovereignty and permit organized and effective delivery of services to persons living on reservation lands. There is nothing in the legislative and administrative history of the Reservation to suggest that the Secretary lacks the authority to support the development of tribal governments.

The Reservation was established pursuant to the Act of April 8, 1864, 13 Stat. 39, which authorized the President to locate not more than four Indian reservations in California, at least one of them to be in the northern district of the state. Public notices were posted in 1864 and 1865 without mention of any Indian tribe by name and without intimation of which tribes were to occupy the Reservation. The same is true of President Grant's executive order of 1876 that formally established the Reservation and its boundaries. *Short I*, 202 Ct.Cl. at 876–78, 486 F.2d at 563. Since there were to be no more than four reservations in the state, it was inevitable that each reservation could and almost certainly would be occupied by more than one ethnological tribal group.

The Addition or Hoopa Extension was added to the Reservation by order of President Harrison in 1891. That executive order expanded the size of the Hoopa Valley Reservation to include the "Old Klamath River Reservation" and the connecting strip. *Mattz v. Arnett*, 412 U.S. 481, 493, 93 S.Ct. 2245, 2252, 37 L.Ed.2d 92 (1973); Fndg. 9, *Short I*, 202 Ct.Cl. at 887, 486 F.2d 561. Plaintiffs argue that this joinder, which gave rise to the substantive rights in the unallotted Reservation resources distributed per capita, also entitles them to receive a share of monies appropriated to the Hoopa Valley Tribe.

▮ Plaintiffs, like non-Indians within Indian country, do benefit from the presence of an organized tribal government and also benefit from general federal services administered by the Tribe that are not premised upon Hoopa membership. *See* 18 U.S.C. § 1151 (1982) (definition of Indian country). To be sure, plaintiffs arguably were not benefited by tribal services that they were ineligible to receive because they were not enrolled Hoopas. However, an individual Indian's rights in tribal or unallotted property arises only upon individualization; individual Indians do not hold vested severable interests in unallotted tribal lands and monies as tenants in common. *See United States v. Jim*, 409 U.S. 80, 82–83, 93 S.Ct. 261, 263, 34 L.Ed.2d 282

(1972); *Gritts v. Fisher*, 224 U.S. 640, 642, 32 S.Ct. 580, 581, 56 L.Ed. 928 (1912); Felix S. Cohen's Handbook of Federal Indian Law, *supra*, at 605–06. Just as an enrolled Hoopa could not claim a "share" of monies used by the Hoopa Valley Tribe as a government, plaintiffs may not recover a portion of monies distributed to the Tribe. Thus, payments made to the Tribe will not be credited to or deducted from the plaintiffs' award as individuals.

The Secretary may choose to make future distributions on a tribal basis, make additional per capita payments to individuals, or both, but the distributions must be made in a non-discriminatory manner. To mandate that the Secretary distribute monies dollar-for-dollar between an organized tribal government and a group of individual Indians could hinder the Secretary's implementation of the Congress' and the Executive's policy of strengthening tribal governance and self-determination. *See* Indian Self-Determination and Education Assistance Act, Pub.L. No. 93–638, 88 Stat. 2203, codified at 25 U.S.C. §§ 450, *et seq.* (1982 & Supp. III 1985); President's Statement on Indian Policy, 19 Weekly Comp.Pres.Doc. 98, 99 (Jan. 24, 1983).

### D. *Interest on the Amounts Owed*

▮ In this case, as in *Mitchell II*, the timber statute in question, 25 U.S.C. § 407, has waived the government's sovereign immunity, permitting recovery of damages sustained from a breach of trust. *Short III*, 719 F.2d at 1134–35; *see Mitchell II*, 463 U.S. at 222–26, 103 S.Ct. at 2970–73. Despite this waiver, as a general matter, interest is not assessable in claims against the United States unless a Fifth Amendment taking has occurred, or unless interest is provided for in an express contractual provision or by statute. 28 U.S.C. § 2516(a) (1982); *United States v. Alcea Band of Tillamooks*, 341 U.S. 48, 49, 71 S.Ct. 552, 95 L.Ed. 738 (1951); *United States v. Mescalero Apache Tribe*, 207 Ct.Cl. 369, 380, 518 F.2d 1309, 1316 (1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). Nor can interest be awarded on the basis of policy, *United States v. N.Y. Rayon Importing Co.*, 329

U.S. 654, 658–59, 67 S.Ct. 601, 603–04, 91 L.Ed. 577 (1947), or implied notions of just compensation, *United States v. Thayer-West Point Hotel Co.*, 329 U.S. 585, 588–90, 67 S.Ct. 398, 399–401, 91 L.Ed. 521 (1947). Recovery of interest in a judgment is also prohibited where a statute otherwise provides for interest, but the monies at issue were never held by the government in an interest-bearing account. *Navajo Tribe v. United States*, 9 Cl.Ct. 227, 271 (1985); *Mitchell v. United States*, 229 Ct.Cl. 1, 16, 664 F.2d 265, 275 (1981), *aff'd*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

■ Plaintiffs argue, in addition to their claim that interest is authorized by statute, that a Fifth Amendment taking has occurred. That issue need not be addressed since 25 U.S.C. §§ 161a, 161b, 162a provide for the payment of interest for the type of funds in question. The defendant concedes that the unallotted Reservation income was held in an "Indian Monies, Proceeds of Labor" (IMPL) account, but argues that plaintiffs, as individuals, may not claim interest on such accounts because such monies are held for "tribes," under 25 U.S.C. §§ 161a, 161b, 162a. Further, the defendant argues, once these monies were individualized and distributed to Hoopas, the monies lost their interest-bearing nature as "tribal" funds, therefore barring the plaintiffs' interest claim. This argument is not persuasive.

The accounts of revenues from unallotted lands are tribal or communal in nature, as distinguished from Individual Indian Money (IIM) accounts held for individual Indians, which are not necessarily required by statute to gather interest. *See American Indians Residing on the Maricopa—Ak Chin Reservation v. United States*, 229 Ct.Cl. 167, 203–04, 667 F.2d 980, 1003 (1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). Unlike the situation in *Navajo Tribe*, where the claimed monies were never deposited in an interest-bearing account, it is clear that these IMPL funds were held by the government in trust accounts and were accumulating interest pursuant to express statutes.

The income from unallotted Reservation lands was held in U.S. Treasury Account 14X7236—"Proceeds of Labor, Hoopa Valley Indians," and the interest from these proceeds was held in U.S. Treasury Account 14X7736. *See* Fndgs. 167–72, *Short I*, 202 Ct.Cl. at 970–72, 486 F.2d 561. These types of funds were required to accumulate simple interest at the rate of four percent per annum, pursuant to the Act of June 13, 1930, 46 Stat. 584, codified at 25 U.S.C. §§ 161a, 161b (1982). In 1984, this interest provision was amended by the Act of Oct. 4, 1984, Pub.L. No. 98–451, 98 Stat. 1729, mandating that the minimum interest collection rate be at rates as determined by the Secretary of the Treasury, rather than the flat four percent. 25 U.S.C. § 161a (Supp. III 1985). These funds could also have been invested, and the defendant concedes were invested, under the provisions of 25 U.S.C. § 162a (1982) in bank accounts for interest higher than the four percent of §§ 161a, 161b.

■ But for the defendant's wrongful distribution, the plaintiffs' shares of the unallotted income would have continued to accrue interest. In fact, the accumulated escrow fund monies still held by the government continue to accrue interest. While IMPL accounts are tribal or communal in nature, *individual* Hoopas received portions of both accounts, including the accrued interest, in their per capita payments. Thus, qualified plaintiffs should be treated similarly. The government may not eliminate liability for interest mandated by statute simply by wrongfully disposing of the principal to others. The standard of duty the government owes as a trustee to Indians is not mere reasonableness, but rather the highest fiduciary standard. *American Indians Residing on the Maricopa—Ak Chin Reservation*, 229 Ct.Cl. at 182, 667 F.2d at 990. Where, as here, funds were bearing interest by statute in the U.S. Treasury, and were disposed of wrongfully, the government is liable for interest. *United States v. Gila River Pima—Maricopa Indian Community*, 218 Ct.Cl. 74, 85–86, 586 F.2d 209, 216–17 (1978); *see Coast Indian Community v.*

*United States,* 213 Ct.Cl. 129, 157–58, 550 F.2d 639, 655 (1977).

▆ Compound interest, or interest on interest, may not be assessed against the United States under § 161a. *Menominee Tribe v. United States,* 97 Ct.Cl. 158, 162–63 (1942) (interest requirements of 25 U.S.C. § 161a applicable only to principal, not interest accounts). Therefore, plaintiffs' recovery of interest pursuant to § 161a will be computed to include simple interest only on the principal portion of the share that plaintiffs would have received from the date of each distribution to the effective date of the amendment to § 161a. For the period after the effective date of the amendment to § 161a, interest will be paid pursuant to that amended section.

Plaintiffs argue that they should recover a "reasonable rate" of interest, correctly stating that the statutory four percent interest rate on IMPL funds is a floor rather than a ceiling. *Mitchell,* 229 Ct.Cl. at 15–16, 664 F.2d at 274; *Cheyenne-Arapaho Tribes v. United States,* 206 Ct.Cl. 340, 348, 512 F.2d 1390, 1394 (1975). The award of an interest rate higher than that provided by §§ 161a, 161b is available for funds invested by the Secretary in banks under § 162a. However, the recovery of a higher rate under § 162a is premised upon a showing of higher investment opportunities available to the government during the period in question. *Cheyenne-Arapaho Tribes,* 206 Ct.Cl. at 349–51, 512 F.2d at 1395–97. Provided such a showing is made, post-distribution interest rates will be at a higher rate as provided by 25 U.S.C. § 162a, as amended on Nov. 4, 1983 by Pub.L. No. 98–146, 97 Stat. 929. 25 U.S.C. § 162a (Supp. III 1985). Even without a showing of higher investment opportunity, the rate will be no less than the four percent required under 25 U.S.C. §§ 161a, 161b, and the rate determined by the Secretary of the Treasury for the period after the effective date of the amendment of § 161a.

### E. *Monies Remaining in the Short Escrow Fund*

▆ Plaintiffs seek to have this court award them the so-called *Short* escrow fund in its entirety, arguing that the accumulated income and interest represents their exclusive share of Reservation income collected since 1974. However, under 28 U.S.C. § 1491, this court may award only "actual, presently due money damages from the United States." *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976) (quoting *United States v. King,* 395 U.S. 1, 3, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969)). Plaintiffs have not been damaged with respect to these funds, still held in the U.S. Treasury, and which remain subject to the Secretary's discretion under 25 U.S.C. § 407. To date the Secretary's conduct with regard to these monies remaining in the escrow fund, has not given rise to an action for damages for injuries sustained.

This court cannot grant prospective relief for contemplated injury in the future, or issue a general declaratory judgment under its jurisdictional constraints. The law of this case does require that if the Secretary decides to make per capita distributions of unallotted Reservation income, all persons who fall into the category of an Indian of the Hoopa Valley Reservation, alive at the time of a given distribution, be included. However, until these monies are individualized or otherwise handled contrary to law, plaintiffs have not been injured with respect to these funds, and the requested relief will not be granted.

The Hoopa Valley Tribe has expressed some concern that the defendant will attempt to pay damages to the plaintiffs from the monies remaining in the escrow fund. While the defendant-intervenor requests this court to direct the disposition of the escrow funds for its benefit, this issue is not yet ripe for decision, and there is serious doubt whether such authority is within the scope of the court's powers absent a definitive action causing injury.

The Secretary is given authority to manage timber resources on Indian lands under 25 U.S.C. § 407. This court will not substitute its judgment for that of the Secretary, who is in a better position to determine the needs of the Reservation and its

residents. Under § 407, Congress has stated that the income from the sale of timber on unallotted lands "shall be used for the benefit of the Indians who are members of the tribe or tribes concerned in such manner as [the Secretary] may direct," allowing only for administrative expense deductions. 25 U.S.C. § 407 (1982). While the Secretary does exercise discretion over these funds, such discretion is not unlimited. The action must be consistent with the government's overriding fiduciary obligation to Indian tribes and individual Indians in the management of their resources, property, and affairs. The violation of these duties under the statute would give rise to an action for money damages. *Mitchell II*, 463 U.S. at 226, 103 S.Ct. at 2972; *Short III*, 719 F.2d at 1135; *White Mountain Apache Tribe v. United States*, 11 Cl.Ct. 614, 669 (1987); *Navajo Tribe*, 9 Cl.Ct. at 232. However, until such a violation occurs, this court is constrained from ruling with regard to this issue.

## CONCLUSION

Recovery of damages for those plaintiffs who qualify as Indians of the Reservation will be calculated based upon their wrongful exclusion from prior per capita distributions, which includes their shares as calculated above, plus interest as provided by statute. The *Short* escrow funds remain subject to the Secretary's discretion, and shall be expended as the Secretary determines, for the benefit of the Indians of the Reservation as provided by statute, and in a manner otherwise consistent with this opinion and previous court decisions.