DAVIS, Circuit Judge.
 

 This ancient case (commenced against the Government in the Court of Claims some two decades ago) comes once again for appellate scrutiny. Ten years ago, in 486 F.2d 561, 202 Ct.Cl. 870 (1973),
 
 cert. denied,
 
 416 U.S. 961, 94 S.Ct. 1981, 40 L.Ed.2d 313, the Court of Claims decided that the Hoopa Valley Reservation was one reservation all of whose Indian peoples (including, in general, non-Hoopa Indians residing on or connected with the reservation) were “Indians of the Reservation” entitled to equal rights in the division of timber profits (and other income) from the unallotted trust land of the reservation, and therefore that the United States had wrongfully paid those profits exclusively to the members of the
 
 *1134
 
 Hoopa Valley Tribe.
 
 [1]
 
 In 209 Ct.Cl. 777 (1976), the court allowed interventions by new plaintiffs and closed the class of plaintiffs (now amounting to some 3800). In 661 F.2d 150, 228 Ct.Cl. 535 (1981),
 
 cert. denied,
 
 455 U.S. 1034, 102 S.Ct. 1738, 72 L.Ed.2d 153 (1982), the court denied new motions to dismiss and to substitute the Yurok Tribe as plaintiff, and directed the trial judge to recommend standards for the qualification of the approximately 3800 remaining plaintiffs as Indians of the Hoopa Valley Reservation entitled to share in the income of the Reservation. On March 31,1982, then Trial Judge Schwartz, who had long handled the case at the trial level, issued his opinion on that subject. In that decision, he established standards for qualifying the various plaintiffs and granted and denied the plaintiffs’ motions for summary judgment in accordance with those standards. All parties appeal from that decision which is now before us.
 
 [2]
 

 Shortly before and at the oral argument of this appeal, the United States and the Hoopa Valley Tribe raised again the issue of the jurisdiction of the Court of Claims (and, now, of the Claims Court) over the entire suit. Though the question of the court’s jurisdiction had been previously raised (and jurisdiction sustained) on a number of occasions, the new challenge was on grounds not before articulated (though the assault was one that could readily have been presented much earlier). We allowed the Government and the Hoopa Valley Tribe to file motions to dismiss on the new basis, and those motions have been extensively briefed. We withheld decision on the appeal until the Supreme Court had decided
 
 United States v. Mitchell,
 
 U.S.Sup.Ct., Oct. Term 1982, No. 81-1748
 
 (Mitchell II).
 
 That decision was rendered on June 27, 1983 (— U.S.—, 103 S.Ct. 2961, 77 L.Ed.2d 580), and we then allowed the parties to brief the impact on the present case of the Supreme Court’s recent opinion and ruling. We are now ready to dispose of the current appeal.
 

 In Part I of this opinion,
 
 infra,
 
 we discuss the new challenge to jurisdiction and reject it, especially in the light of
 
 Mitchell II.
 
 In Part II,
 
 infra,
 
 we consider the merits of Judge Schwartz’s standards and affirm them, as well as his conclusions of law.
 

 I.
 
 Jurisdiction
 

 This is an action for monies said to have been illegally distributed to members of the Hoopa Valley Tribe, without any share going to those of the plaintiffs who qualify as Indians of the Hoopa Valley Reservation. The details are set forth in the Court of Claims’ decisions reported at 486 F.2d 561 and 661 F.2d 150. The current jurisdictional attack
 
 [3]
 
 is that Congress has not waived sovereign immunity for the suit and in any event that plaintiffs have no substantive claim for money from the United States (even if their allegations and substantive positions are sustained, as they have been).
 

 A.
 

 In
 
 Mitchell II,
 
 the Supreme Court upheld jurisdiction in the Court of Claims (and, now, in the Claims Court) of a suit by Indian plaintiffs for damages for breach of fiduciary duties by the Government. On the jurisdictional issue now before us, the current case is essentially governed by that recent decision. Just like
 
 Mitchell II,
 
 this litigation concerns Indian-owned forest lands on an Indian reservation (there, the Quinault Reservation in Washington; here, the Hoopa Valley Reservation in California), with these forest resources being man
 
 *1135
 
 aged by the Department of the Interior which exercises “comprehensive” control over the harvesting of the Indian timber.
 
 See
 
 Part III of the Supreme Court’s opinion in
 
 Mitchell
 
 II, — U.S. at —, 103 S.Ct. at 2969-2974;
 
 also see
 
 — U.S. at —, 103 S.Ct. at 2965-2966. The “broad” statutory authority of the Secretary of the Interior over the sale and management of the timber on the two reservations is precisely the same,
 
 i.e.,
 
 25 U.S.C. §§ 405-406. In
 
 Mitchell,
 
 those plaintiffs claimed breach by the Government of fiduciary duties in the management and sale of the timber; here, plaintiffs likewise claim breach of such fiduciary duty. The difference is that in
 
 Mitchell II
 
 the alleged injury had to do with such things as the price obtained for the timber, failure to manage on a sustained yield basis, and exacting improper fees and charges — here the injury is the discriminatory distribution of the proceeds of the timber sales and management (and other Reservation income). The Supreme Court expressly held that the statutes and regulations relating to the management of Indian timber,
 
 see
 
 primarily 25 U.S.C. §§ 405-407, established a fiduciary relationship with respect to the timber, and because they clearly established such “fiduciary obligations of the Government in the management and operation of Indian land and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained. Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties.” —U.S. at—-—, especially —, 103 S.Ct. at 2971-2973, especially 2972. It must also follow that the Government was under fiduciary obligations with respect to the comparable Indian forest lands involved here, and is liable for breach of fiduciary obligation in failing to distribute the sale proceeds (and other income) to persons entitled to share in those proceeds — such as those plaintiffs who turn out to be qualified in this case.
 

 B.
 

 The contentions of the Government and of the Hoopa Valley Tribe (on the matters discussed in this Part I) that have survived
 
 Mitchell
 
 II
 
 [4]
 
 all lack merit. First, it is conceded that
 
 Mitchell II
 
 destroys the argument that there has been no waiver of sovereign immunity. The Supreme Court ruled, overriding prior intimations to the contrary, that the Tucker Act is the only necessary consent to suit where statutes and regulations create substantive rights to money damages against the United States. —U.S. at—, 103 S.Ct. at 2969. “If a claim falls within this category, the existence of a waiver of sovereign immunity is clear” and the statutes or regulations founding the claim “need not provide a second waiver of sovereign immunity.”
 
 Id.
 
 The opinion went on to declare that, in determining whether statutes or regulations create substantive rights to money, the court need not construe them “in the manner appropriate to waivers of sovereign immunity.”
 
 Id.
 

 The remaining issue (for this Part I) is whether there are statutes or regulations creating substantive rights to money. As we have said
 
 supra, Mitchell II
 
 specifically held that the forest management laws and regulations (which likewise pertain to this case) do create such substantive rights to money. The Government and the Hoopa Valley Tribe now try to distinguish
 
 Mitchell II
 
 by saying that that case involved only allotted lands, while the present litigation concerns unallotted lands. The former are dealt with in 25 U.S.C. § 406 and the latter in 25 U.S.C. § 407. But the Supreme Court’s whole opinion consistently treats together
 
 both
 
 sections (and the regulations under them) in ruling that the statutory scheme creates a fiduciary duty toward the Indians entitled to the proceeds of the forest. See — U.S. at—, —,—- —,—-—, 103 S.Ct. at 2963-2964, 2964-2965, 2969-2971, 2971-2974. The
 
 *1136
 
 comprehensive control by the Interior Department is precisely the same for both types of land, and that is the primary reason for finding a fiduciary duty on the part of the Government, — U.S. at —- —, 103 S.Ct. at 2971-2974. The purpose to benefit the Indians is equally clear. Section 407 (treating with unallotted lands) authorizes sale by Interior of timber on unallotted lands, and then specifically provides that “the proceeds from such sales * * shall be used for the benefit of the Indians who are members of the tribe or tribes concerned in such manner as [the Secretary] may direct.” In this respect there is no substantial difference between sections 406 and 407,
 
 [5]
 
 and both “can fairly be interpreted as mandating compensation by the Federal Government for damages sustained.” — U.S. at —, 103 S.Ct. at 2973-2974.
 

 Both movants (the Government and the Hoopa Valley Tribe) also make much of the fact that the Act of April 8, 1864, 13 Stat. 39, which authorized the establishment of the Hoopa Valley Reservation and on which the Court of Claims primarily based its determination that qualified plaintiffs were entitled to share in the disputed monies (although they were not members of the Hoopa Valley Tribe), did not contain any authorization to the Government to sell or manage timber or empower the Government to distribute the proceeds. That may be true but it is irrelevant to the jurisdictional point before us. When this action was begun in 1963, the timber management legislation (mainly 25 U.S.C. §§ 405-407) and the regulations thereunder, which do sustain jurisdiction, had long been on the books
 
 [6]
 
 and covered all the monies claimed in the suit (which do not go back beyond the six years prior to the commencement of the action in 1963). The function of the 1864 statute is to help show that the Government had a fiduciary relationship toward qualified plaintiffs with respect to the Hoopa Valley Reservation and also to show that the Secretary’s action in excluding all but members of the Hoopa Valley Tribe from the distribution of the monies was unlawful.
 

 It is also said that 25 U.S.C. § 407 directs use of the timber proceeds for the benefit of Indians “who are members of the tribe or tribes concerned,” and that none of the plaintiffs is a member of an organized or recognized “tribe” (as the Hoopa Valley Tribe has been since 1950). But it is clear to us that Congress, when it used the term “tribe” in this instance, meant only the general Indian groups communally concerned with the proceeds — not an officially organized or recognized Indian tribe — and that the qualified plaintiffs fall into the group intended by Congress. This was in effect an implicit holding of the Court of Claims when it decided in 1981
 
 (en banc)
 
 that the non-organized Yurok tribe should not be substituted for the present plaintiffs. 661 F.2d at 153-156. In any event, it is the proper interpretation if, as has already been held, qualified plaintiffs are entitled to recover a proper share of the proceeds. From its original enactment in 1910 until its amendment and reenactment in April 1964, § 407 provided that proceeds from the sale of timber on unallotted lands “shall be used for the benefit of
 
 Indians of the Reservation
 
 ” (emphasis added).
 
 [7]
 
 The 1964 substitution of “members of the tribe or tribes concerned” for “Indians of the Reservation” was obviously not designed to cut off existing rights of Indians of a reservation with respect to communal land (or to change the definition of those entitled) but rather more clearly to allow coverage of Indians who were entitled to proceeds from reservation property but who happened to reside elsewhere than on the reservation. H.R.Rep. No. 1292, 88th Cong., 2d Sess.,
 
 reprinted in
 
 
 *1137
 
 1964 U.S.Code Cong. & Ad.News 2162-68.
 
 [8]
 
 The word “tribe” (as related to Indians) has no fixed, precise or definite meaning but can appropriately include “Indians residing on one reservation.” See the definition in 25 U.S.C. § 479 (part of the Indian Reorganization Act of June 18, 1934). With respect to the Hoopa Valley Reservation, that is its meaning in 25 U.S.C. § 407.
 

 Finally, there can be no doubt whatever that, if the Secretary decides (as he has) to distribute proceeds under § 407, he must act non-discriminatorily and cannot exclude any of those Indians properly entitled to share in the proceeds. In this instance the Court of Claims has twice held that qualified plaintiffs are entitled to share and that their exclusion was arbitrary (see 202 Ct.Cl. 870, 980-81 (finding 189); 661 F.2d at 155) —and those holdings are the law of this case. In § 407 Congress obviously did not permit the Secretary, once he decides to distribute proceeds, to make arbitrary classifications in distributing those proceeds.
 

 C.
 

 A conceptually separate (though closely related) ground of jurisdiction is supplied by the fact that plaintiffs are suing for a portion of the funds collected by the Government from sales of Indian timber and initially deposited in trust funds in the Treasury before the illegal distribution. Most (if not all) of the monies for which plaintiffs are suing were deposited in the Treasury in a “proceeds of labor” account or an account for “interest on proceeds of labor.”
 
 See
 
 202 Ct.Cl. at 970-71. Under 31 U.S.C. § 1321(a)(20) (as previously worded and as worded in Pub.L. 97-258, Sept. 13, 1982, 96 Stat. 919) those are designated trust funds; accordingly, the proper beneficiaries can sue under the Tucker Act if those funds illegally leave the Treasury. There is, of course, jurisdiction to decide whether claimants are proper beneficiaries (at least if, as here, their claims are substantial and non-frivolous). It has now been decided (in the Court of Claims decisions already cited) that qualified plaintiffs have a direct interest in those funds, which are now or previously were in the Treasury, and are proper beneficiaries. They therefore have a right to sue for the parts of those funds improperly distributed to others or illegally withheld from those claimants.
 
 Eastport S.S. Corp. v. United States,
 
 372 F.2d 1002, 1007, 178 Ct.Cl. 599 (1962);
 
 Hoopa Valley Tribe v. United States,
 
 596 F.2d 435, 436-37, 219 Ct.Cl. 492, 493-94 (1979). If, as here, monies are collected and held by the Government for particular persons, the Tucker Act authorizes suit even though the person has not himself paid over the money.
 
 See Mitchell II,
 
 — U.S. at —, fn. 23, 103 S.Ct. at 2971, fn. 23.
 

 D.
 

 For these reasons we deny the motions to dismiss and reaffirm the jurisdiction of the Court of Claims and the Claims Court over this action.
 

 II.
 
 Merits
 

 On its merits this case presents the standards to be applied in determining those of the 3800 plaintiffs who are qualified to share in the Reservation’s timber proceeds (and other income) as Indians of the Reservation.
 
 [9]
 
 This is a matter of individual entitlement not of tribal membership for other purposes.
 
 See Short v. United States, supra,
 
 661 F.2d at 154. In its
 
 en banc
 
 decision of September 23, 1981, the Court of Claims, 661 F.2d 150, 158-59, held that (a) “the standards used to determine the membership of the Hoopa Valley Tribe
 
 *1138
 

 [i.e.,
 
 those who actually received shares of the monies] also provide an appropriate basis for determining which of the plaintiffs are Indians of the Reservation”; (b) the trial judge should initially formulate those standards but in doing so “basically should apply” the Hoopa Valley Tribe standards; (c) the trial judge had, however, “sound discretion to determine what, if any, changes should be made in the Hoopa standards and in the application of the governing standards in individual cases”; and finally (d) “[t]here is need for some flexibility, so that recognition can be given to the small number of cases in which the [Hoopa] standards cannot be strictly applied or in which their strict application would produce manifest injustice. Moreover, there may be differences between the situations of the Hoopas and the Yuroks [plaintiffs claim to be Yuroks] that necessitate some differences in the standards governing the membership of the two Tribes.”
 
 [10]
 

 Judge Schwartz’s comprehensive and careful opinion is designed to meet those directives. First he set out in detail the standards actually used for membership in the Hoopa Valley Tribe (and therefore actually used for distribution of the monies in question). Then he applied those standards to the group of plaintiffs, making changes needed to obviate “the factors wrongfully used to exclude the claimants from the distribution” and in part to conform to the different history of plaintiffs’ group from that of the Hoopas. For details of the trial judge’s determinations, we refer to his opinion. His summary of conclusions, which we affirm, is reproduced in the Appendix to this opinion.
 
 See also
 
 note 14,
 
 infra.
 

 [11]
 

 We discuss below the objections raised by the various parties to Judge Schwartz’s conclusions.
 

 A.
 
 Plaintiffs-Appellants’ Objections
 

 Judge Schwartz found that the Hoopas had separate schedules of membership, depending generally on the relationship of the individual to the Hoopa tribe or the Square (where the Hoopas lived) as of various dates (Schedules A, B, and C).
 
 [12]
 
 As we have said, he then formulated analogous groups of plaintiffs, as shown in the Appendix to our opinion (these were grouped into five Attachments).
 
 [13]
 
 The trial judge also indicated
 
 *1139
 
 that individual plaintiffs, not included in one of these five groups, could subsequently seek qualification on the basis of “manifest injustice” and the individual’s particular set of circumstances.
 

 Plaintiffs challenge the composition of the trial judge’s five groups, mainly on the ground that he should not have used the dates and some of the standards the Hoopas used because, it is said, those dates and standards were peculiar to events and circumstances in Hoopa history and immaterial to the history of the plaintiffs or of the Yuroks who did not live on the Square (the portion of the Hoopa Valley Reservation occupied by the Hoopas). There are two sets of plaintiffs represented by different counsel; between them they raise the following points: (1) census enrollees (on the whole Reservation) and their descendants should be considered fully equal to allottees (and their descendants) (Attachment A) for qualification purposes; (2) assignees and their descendants should also be considered fully equal to allottees on Attachment A; (3) Attachment B should include plaintiffs who did not live on the Reservation on October 1, 1949 (as well as those who did); (4) instead of the dates employed by the trial judge (Oct. 1, 1949) (used by the Hoo-pas); June 2, 1953 (also used by the Hoo-pas); August 9, 1963 (considered the commencement of the present suit), the most relevant date should be April 23,1976, when the Court of Claims closed the class of plaintiffs; and (5) application of the Hoopa Valley Tribe’s criteria of blood degree for those born after October 1, 1949 (see Attachments D and E) is error.
 

 In appraising these points — which were made before the trial judge and which he considered — we are governed, as he was, by the fundamental premise, enunciated by the
 
 en banc
 
 Court of Claims in 1981 — and of course binding on us — that “the standards used to determine the membership of the Hoopa Valley Tribe
 
 [14]
 
 also provide an appropriate basis for determining which of the plaintiffs are Indians of the Reservation” entitled to recovery here. 661 F.2d at 158. Some leeway was allowed to the trial judge but the Hoopa Valley Tribe standards were to be the matrix. We cannot agree with plaintiffs’ apparent views that major surgery, with profound alterations, was contemplated, or that the function of the trial judge, under the Court of Claims’ 1981 decision, was basically to decide
 
 de novo,
 
 with some reference to the standards of the Hoopa Valley Tribe, who were “Indians of the Reservation.” Moreover, in the limited area where the trial judge had leeway, it was recognized by the Court of Claims to be within his “sound discretion,” 661 F.2d at 159, a discretion which he has exercised and which is subject to review here only for abuse. There is also one more general factor we must consider. The Court of Claims was very eager to bring this long-lasting case to its proper conclusion, and that was a prime reason it determined to follow the general outline of the existing Hoopa standards,
 
 see
 
 661 F.2d at 157-159. Unnecessary further proceedings to determine qualification should therefore be avoided.
 
 [15]
 

 In this light we reject plaintiffs’ objections (as we do those of the Government and the Hoopa Valley Tribe,
 
 see infra).
 
 Judge Schwartz correctly framed his standards on the standards of the Hoopa Valley Tribe, and he did not abuse his discretion in refusing to make the further changes plaintiffs sought.
 

 The refusal to include all assignees (and their descendants) on Attachment A (note 14,
 
 supra;
 
 Appendix,
 
 infra)
 
 was warranted because (1) Schedule A of the Hoopa list (note 13,
 
 supra)
 
 was definitely limited to allottees (and their descendants); (2) Attachment B of the trial judge’s standards
 
 *1140
 
 (note 14,
 
 supra;
 
 Appendix, infra) specifically takes account of those Indians holding assignments; and (3) the trial judge’s opinion also expressly leaves open to any plaintiff “who can qualify only on the basis of an assignment held by the plaintiff or an ancestor” to argue in further proceedings that he is entitled to recover on the basis of “manifest injustice” (recognized by the Court of Claims, 661 F.2d at 158) in view of the facts of his individual case. These are good reasons for the judge’s position. As for those who had (or whose forebears had) census enrollments (but neither allotments nor assignments), Judge Schwartz refused to consider that as a
 
 per se
 
 mark of qualification because (1) “though census enrollment bespeaks a tie to the Reservation, it does not establish an attachment to the Reservation equal to that of allotment, which is ownership of the land”;
 
 [16]
 
 (2) some enrollees lived off ■ the Reservation while residence was required for an allotment (or assignment); and (3) relief could be available under the “manifest injustice” standard by proof of census enrollment plus other adequate ties to the Reservation. Taken together, that is most certainly a sensible stance.
 

 Use of the blood degree provisions of Hoopa Schedule C (note 13, supra), in formulating the trial judge’s standards for Attachments C, D and E (note 14,
 
 supra;
 
 Appendix, infra), is also acceptable. That was an integral requirement for those Hoopas not on Schedules A and B, and therefore should be followed in trying to approximate those who would have appeared on those rolls for the distribution of the monies if those rolls had been properly prepared and not limited to Hoopas alone. So also for the general residence requirement for Attachment B (note 14,
 
 supra;
 
 Appendix,
 
 infra);
 
 that requirement was directly based on Hoopa Schedule B (note 13,
 
 supra)
 
 which undoubtedly called for residence on the Reservation.
 
 [17]
 

 The most substantial of plaintiffs’ objections relate to the use in the new standards of dates directly concerned with Hoopa history alone (October 1, 1949; June 2, 1953) and not otherwise pertinent to plaintiffs. But we cannot say that the trial judge erred in directly following the Hoopa standards, as the Court of Claims ordered him to do, or that he abused his discretion in refusing to employ later or other dates. The purpose of the exercise, for this case, is to pay to those plaintiffs, deprived by the Hoopa standards of proper payment, the share they would have been paid under those standards if those criteria had included all the Indians of the Reservation, not merely the Hoopas alone. To achieve that end, it is relevant to consider the dates actually used in determining to whom to pay out the monies in question. In particular, it would not be right to advance the date for qualification (as plaintiffs ask) to April 23, 1976, when the Court of Claims allowed no further plaintiffs to be added; that date has no connection whatever with the substantive issues the Court of Claims considered and which we are now considering.
 
 [18]
 

 B.
 
 The Government’s Objections
 

 The Government has five objections to the trial judge’s standards, none of which we accept. We treat them in turn.
 

 1. In view of Hoopa Schedule B (note 13,
 
 supra),
 
 the proposal is that the trial
 
 *1141
 
 judge’s Attachment B (note 14,
 
 supra;
 
 Appendix,
 
 infra)
 
 be modified to require additional factual proof and analysis (in further proceedings) of plaintiffs’ participation in benefits and services before inclusion in Attachment B. Only in that way, the United States says, can it be known that plaintiffs included in Attachment B have a connection with the Reservation analogous to that of Hoopas listed in Schedule B. We think, however, that Attachment B, as now worded, is clearly analogous in its terms to Hoo-pa Schedule B and we leave it to the trial judge’s discretion, on remand, to implement the general standard of Attachment B as he sees fit. It is needless, and surely would not advance this litigation to its conclusion, for us to mandate further particular proceedings if the trial judge properly believes that he can decide inclusion in Attachment B on the basis of the materials and information already available to him.
 

 2. The United States disapproves of any consideration of assignments to plaintiffs (or their forebears)
 
 (see
 
 Attachment B, note 14,
 
 supra;
 
 Appendix,
 
 infra)
 
 because the Hoopa tribe did not use assignments in deciding who of that tribe’s members should share in the disputed payments. We agree with the trial judge that this practice of the Hoopas is not controlling. It may not have been necessary for the Hoopas to use assignments, but it is nevertheless clear that the same qualifications were required for an assignment as for an allotment; it was scarcity of land at the time that accounted for the making of assignments instead of allotments. Both show attachment to the land. We have already rejected
 
 (see
 
 Part II, A,
 
 supra)
 
 plaintiffs’ desire to place all assignees (along with allottees) in Attachment A. But that is no reason to differ with Judge Schwartz in his careful treatment of assignees in Attachment B, and also as possible part of proof showing “manifest injustice.”
 

 3. Objection is likewise made to the trial judge’s contemplation that census enrollments can be used in connection with proof of “manifest injustice.” See Part II, A, supra. But proof must in any case show adequate ties to the Reservation, and a census enrollment can certainly be one factor in that proof. There should be no automatic rule totally excluding such enrollments from being given any consideration in any case.
 

 4. The Government takes exception to the inclusion of six Indian groups (Karok, Sinkyone/Sinkiene, Tolowa, Wintun, Wiyot and Wailake/Wylackie) in the trial judge’s concept of Reservation Indian blood for Attachments C, D and E (note 14,
 
 supra;
 
 Appendix,
 
 infra).
 
 The Government says that those six groups had inadequate connection with the Reservation. Though there may be evidence and material going the other way as to each of those six, there was also sufficient support for the trial judge’s finding to require us to uphold it under the “clearly erroneous” standard.
 

 5. Finally, the United States argues that no plaintiff who is a member of another tribe or band should be allowed to recover in this action. This is the plea for “disqualification by dual tribal status” that the trial judge expressly rejected. We agree with him. As Judge Schwartz carefully pointed out, there is no good proof that the Hoopas ever disqualified any Hoopa from receiving a share of the monies in question because of “dual membership.” Nor do the Hoopas’ official standards exclude Indians who have “dual membership” from sharing in the monies at issue here. In addition, there is no federal statute or regulation barring an Indian from receipt of federal funds simply because he is also a member of another Indian group. Those reasons are enough to refuse to introduce “dual membership” into the standards to govern plaintiffs.’ shares.
 
 [19]
 

 C.
 
 The Hoopa Valley Tribe’s Objections
 

 Cross-appellant Hoopa Valley Tribe (defendant-intervenor in the action) has raised a large number of objections (some of which are the same as the Government’s)
 
 *1142
 
 which amount
 
 in toto
 
 to rejection of almost all of the standards proposed by the trial judge. We do not agree that any of the Tribe’s objections call for modification of the decision below.
 

 1. The Tribe insists that Judge Schwartz erred in finding the Hoopa standards (Schedules A, B, C, note 13
 
 supra)
 
 on the basis of the written documents and refusing to find the “real” or “true” Hoopa standards on the basis of extraneous materials (such as current affidavits) proffered by the Tribe. The short and conclusive answer is that the trial judge’s findings as to those standards (based on the official Hoopa constitution and resolutions, approved by the Secretary of the Interior) accord precisely with the 1973 findings of the Court of Claims, 202 Ct.Cl. at 959-67, which were confirmed by the Court of Claims in 1981, 661 .F.2d at 158. That 1981 decision did not envisage that thé trial judge would engage in a new study and new trial to determine for himself what were the “true” Hoopa standards. It follows that those of the Tribe’s arguments that rest on the Tribe’s current view of the “true” Hoopa standards cannot prevail. The most important of these positions is that Schedule A (note 13,
 
 supra)
 
 required residence on the Square on October 1,1949, although the official Hoopa standards did not say so.
 
 [20]
 
 The same is true of the contention that Schedule A had some specific “Indian blood” requirement. Another is the contention that the residence mentioned in Hoopa Schedule C (note 13,
 
 supra)
 
 must be continuous and as such should be carried over to Attachment C (note 14,
 
 supra;
 
 Appendix,
 
 infra);
 
 there was simply no such requirement in the official Hoopa standards.
 

 2. If the Tribe is still contending that the date for inclusion in Attachment A (note 14,
 
 supra;
 
 Appendix,
 
 infra)
 
 should be that the plaintiff (or perhaps his allottee forebear) was living on
 
 October 1, 1919
 
 (twenty-five years after allotments to non-Hoopas, just as 1949 was about twenty-five years after allotments to the Hoopas), that argument is obviously groundless. The court’s effort is to mold for the non-Hoopa Indians of the Reservation the Hoopa standards used for distribution of the monies in the 1950’s and 1960’s (which of course used October 1, 1949), not to create a fantasy class along new and irrelevant lines which might seem “fairer” to certain people but much less “fair” to others.
 

 3. Hoopa Schedule B (note 13,
 
 supra)
 
 employed subjective standards like “residence not subject to question,” “generally considered as members of the Hoopa Valley Tribe,” and “permitted to participate in tribal affairs.” The trial judge substituted the objective criteria of Attachment B (note 14,
 
 supra;
 
 Appendix, infra), but the Hoopa Tribe urges that he should have included the same subjective criteria as the Hoopas put into Schedule B. This suggestion, too, is unacceptable. To avoid protracted further proceedings in this already too-prolonged litigation, objective criteria are necessary and preferable. Moreover, the kind of proof of “tribal participation” or “community acceptance” the Tribe desires cannot be obtained in the case of non-Hoopas of the Reservation. As the Court of Claims held in 1981, 661 F.2d at 155, (see,
 
 also,
 
 202 Ct.Cl. at 950 (fdgs 109-110), 951-954 (fdgs 113-117), 957 (fdg 126), 958-59 (fdgs 132-135)), there was no similar tribal organization or entity for those non-Hoopas, and the non-Hoopas (excluded from the Hoopa Valley Tribe) could not have “participated” in such organizations. Conversely, there was no non-Hoopa tribal organization which could “generally consider” plaintiffs as “members” or “permit” them to “participate” in its affairs.
 
 (See also
 
 our discussion, Part I, B,
 
 supra,
 
 of the United States’ exception with respect to further individual proof as to receipt of benefits and services.)
 

 4. We also reject the Hoopa Valley Tribe’s proposal that any plaintiff should be automatically disqualified if he or she was eligible for membership in the Hoopa Tribe in 1949 and either did not apply or was turned down. The Hoopa Tribe did not
 
 *1143
 
 distribute applications to everybody who might be eligible (202 Ct.Cl. at 959-960 (fdg 137)), particularly to those who did not live on the Square, and it is indisputable that, in implementing its standards, the Tribe was anxious to exclude persons not considered by them to be Hoopas.
 

 5. The Tribe’s objections respecting assignments, census enrollment, the Indian groups to be considered in determining “Reservation blood,” and “dual membership,” are all essentially the same as those made by the Government, and our reasons for rejecting them are similar.
 
 [21]
 

 To sum up, all parties’ objections to the trial judge’s standards and to his conclusions of law are disapproved.
 

 III.
 
 Nature of our Decision
 

 At the close of our opinion we again stress — what the Court of Claims several times emphasized and we have interlaced
 
 supra
 
 — that
 
 all
 
 we are deciding are the standards to be applied in determining those plaintiffs who should share as individ- ■ uals in the monies from the Hoopa Valley Reservation unlawfully withheld by the United States from them (from 1957 onward). This is solely a suit against the United States for monies, and everything we decide is in that connection alone; neither the Claims Court nor this court is issuing a general declaratory judgment. We are
 
 not
 
 deciding standards for membership in
 
 any
 
 tribe, band, or Indian group,
 
 nor
 
 are we ruling that Hoopa membership standards should or must control membership in a Yurok tribe or any other entity that may be organized on the Reservation. We fully agree with Judge Schwartz that “[s]hould the Yuroks decide to establish a tribe, they are free to vote any membership standard they desire” and we “are not deciding what shall be the membership of a Yurok tribe or of any Indian tribe.” We also agree with him “that the decision reached in this court [both the Claims Court and the Court of Appeals for the Federal Circuit] will obtain only for the years until final judgment, and for the years to come while the situation in the Reservation remains the same subject of course to births and deaths.”
 

 We note, finally, our fervent hope that this very old case will speedily be concluded in the light of the trial court’s judgment now affirmed in its entirety by this court. The case will be remanded to the Claims Court for further proceedings in accordance with this opinion.
 

 Affirmed and Remanded.
 

 APPENDIX
 

 The trial judge’s ultimate decision (“Conclusion of Law”) was as follows:
 

 “For the reasons set out in the foregoing [opinion], it is concluded that the plaintiffs of the following classes are qualified as Indians of the Hoopa Valley Reservation and are therefore entitled, equally with all others qualified, to shares of the profits of the unallotted trust lands of the Reservation. Judgment is given for these plaintiffs, against the Government and the intervening defendant-Tribe, the payor and recipient of sums due the plaintiffs, of the sums payable, the amounts to be ascertained in further proceedings under [then Court of Claims rule 131(c) ]:
 

 1. Allottees of land on any part of the Reservation, living on October 1, 1949, and lineal descendants of allottees living on October 1, 1949.
 

 This class is composed of plaintiffs on attachment A, which is to be a part hereof and to be furnished to the Clerk, to the extent practicable, by defendants jointly, within 30 days of this order.
 

 2. Persons living on October 1,1949, and resident on the Reservation at that time, who have received Reservation benefits or services, and hold an assignment, or can make other proof that though eligible to receive an allotment, they have not been
 
 *1144
 
 allotted, and the lineal descendants of such persons, living on October 1, 1949.
 

 This class is composed of plaintiffs on attachment B, which is to be a part hereof and to be furnished to the Clerk, to the extent practicable, by defendants jointly, within 30 days of this order.
 

 3. Persons living on June 2, 1953, who have at least
 
 Vi
 
 Reservation blood, as defined below, have forebears born on the Reservation and were resident on the Reservation for 15 years prior to June 2, 1953.
 

 This class is composed of plaintiffs on attachment C, which is to be a part hereof and to be furnished to the Clerk, to the extent practicable, by defendants jointly, within 30 days of this order.
 

 4. Plaintiffs of at least
 
 Vi
 
 Indian blood, born after October 1, 1949 and before August 9, 1963 to a parent who is or would have been, when alive, a qualified Indian of the Reservation under any of the foregoing paragraphs 1, 2 or 3, or has previously been held entitled to recover in this case.
 

 This class is composed of plaintiffs on attachment D, which is to be a part hereof and to be furnished to the Clerk, to the extent practicable, by defendants jointly, within 30 days of this order.
 

 5. Plaintiffs born on or after August 9, 1963, who are of at least
 
 Vi
 
 Indian blood, derived exclusively from the qualified parent or parents who is or would have been when alive a qualified Indian of the Reservation under any of the foregoing paragraphs 1, 2 or 3, or has previously been held entitled to recover in this case.
 

 This class is composed of plaintiffs on attachment E, which is to be a part hereof and to be furnished to the Clerk, to the extent practicable, by defendants jointly, within 30 days of this order.
 

 6. Reservation blood, as used herein, shall mean the blood of the following tribes and bands: Yurok, Hoopa/Hupa; Grouse Creek; Hunstang/Hoonsotton/Hoonsolton; Miskut/Miscotts/Miscolts; Redwood/Chilu-la; Saiaz/Nongatl/Siahs; Sermalton; South Fork; Tish-tang-atan; Karok; Tolo-wa; Sinkyone/Sinkiene; Wailake/Wylacki; Wiyot/Humboldt; Wintun.
 

 7. The motions for summary judgment of all plaintiffs not listed on attachments A, B, C, D and E are denied, without prejudice to renewal within three months after this order becomes final, on a certification by counsel of record to the best of his belief, that the facts summarized in the motion, and to be determined on oral or written hearing, demonstrate either the qualification of the plaintiff under one of the standards adopted by the court or that the denial of qualification of the plaintiff would on the special facts of the case be manifestly unjust.
 

 8. The furnishing by defendants of the above-mentioned attachments A, B, C, D, and E, shall be without prejudice to the rights of defendants to challenge this decision or any part thereof. Recently substituted and former counsel for defendant Hoopa Valley Tribe are expected to cooperate so that no time will be lost in the preparation of the lists to become attachments A-E hereto. Defendants are to furnish the Clerk with the original and 12 copies of each of these attachments.
 

 9. The plaintiffs’ motions for summary judgment are denied and granted as provided above.”
 

 [1]
 

 . The Hoopa Valley Tribe, which previously participated as amicus curiae, was permitted to intervene at that time as a party defendant.
 

 See also Hoopa Valley Tribe v. United States,
 
 596 F.2d 435, 219 Ct.Cl. 492 (1979).
 

 [2]
 

 . The parties filed petitions for review of Trial Judge Schwartz’s decision before October 1, 1982. Pursuant to an October 4, 1982 order of this court, the Claims Court entered judgment on October 6, 1982, corresponding to the decision recommended in this case by Trial Judge Schwartz. The case was transferred on October 1, 1982, to this court under section 403 of the Federal Courts Improvement Act of 1982, 96 Stat. 57-8 (April 2, 1982).
 

 [3]
 

 . As we have said, there have been several other jurisdictional challenges in the past — all rejected by the Court of Claims.
 

 [4]
 

 . We refer to the contentions made in the briefs filed with us by those parties after and in the light of
 
 Mitchell II.
 

 [5]
 

 . Section 406 provides that proceeds of sales from allotted land “shall be paid to the owner or owners
 
 or
 
 disposed of for their benefit under regulations to be prescribed by the Secretary of the Interior” (emphasis added).
 

 [6]
 

 . The first of these statutes was enacted in 1910, and the first regulations issued in 1911.
 

 [7]
 

 . This was the way the statute read when this suit was begun in 1963.
 

 [8]
 

 . The Hoopa Valley Tribe attempts, by referring to unpublished testimony at committee hearings and by offering a present-day affidavit of a witness at the hearing in the 1960’s, to persuade us that what is now § 407 was always meant to cover only organized tribes, but this far-fetched “legislative history” is totally unpersuasive (even if admissible, which is very questionable) as against the official history, the terms of the legislation, and the whole context of the unpublished hearings.
 

 [9]
 

 . Judgments have already been entered for 22 plaintiffs determined by the Court of Claims to be qualified and for 121 more whose status the Government did not challenge after the 1973 decision on liability.
 
 See Short v. United States, supra,
 
 661 F.2d at 151, 152, 153, 154.
 

 [10]
 

 . We reiterate, once again, that it has always been plain that this development of standards was solely for the purpose of determining the money judgments in this suit, not for other purposes of tribal membership or organization. See 661 F.2d at 154-55.
 
 See also
 
 Part III,
 
 infra.
 

 [11]
 

 . At the direction of the trial judge, the Government and the Hoopa Valley Tribe filed with the Court of Claims (on May 3, 1982) a list of the plaintiffs who defendants believe qualify under the five standards established by the trial judge (Attachments A through E). These lists were based on information previously supplied by plaintiffs. The joint list included 2161 plaintiffs.
 

 [12]
 

 . In paraphrased summary, these Hoopa schedules were found to be:
 

 Schedule A: Square allottees, or their descendants, living on October 1, 1949;
 

 Schedule B: Indians living as of October 1, 1949, whose residence within the Square was not subject to question, who never received allotments but were generally considered as , members of the Hoopa Valley Tribe and permitted to participate in tribal affairs, and their descendants living on October 1, 1949;
 

 Schedule C: Indians residing within the Hoopa Valley Reservation for a minimum of 15 years, who had forebears born within the 12-mile square Hoopa portion of the Reservation, who had at least !A degree Indian blood, and who filed an application within the 60-day period ending June 2, 1953.
 

 [13]
 

 . In paraphrased summary, Judge Schwartz determined the following groups of plaintiffs to be qualified:
 

 Attachment A: Allottees of the Reservation and their descendants living anywhere on the Reservation on October 1, 1949.
 

 Attachment B: Residents of the Reservation (and their descendents) living on October 1, 1949, who have received Reservation benefits and services, and hold an assignment or can prove entitlement to an allotment.
 

 Attachment C: Persons living on June 2, 1953 with at least ‘A Reservation blood (defined to include a number of tribes connected with the Reservation) who had lived on the Reservation for 15 years prior to June 2, 1953 and have ancestors born on the Reservation.
 

 Attachment D: Persons possessing at least ’A Indian blood and who were born after October 1, 1949 and before August 9, 1963 [the date the present action was commenced] to a parent who did qualify or would have qualified as an Indian of the Reservation under
 

 Attachments A, B or C,
 
 supra.
 

 Attachment E: Persons bom on or after August 9, 1963, of at least 'A Indian blood de
 
 *1139
 
 rived exclusively from a parent or parents who qualified under Attachments A, B or C,
 
 supra.
 

 [14]
 

 . These standards were known in 1981 to the Court of Claims since they had been “described and explained” in the findings in the 1973 decision. See 661 F.2d at 158. The trial judge did not misconstrue them in his opinion which we are reviewing.
 
 See
 
 Part II, C, 1,
 
 infra.
 

 [15]
 

 . Of course, the same general principles apply to our review,
 
 infra,
 
 of the objections of the United States and the Hoopa Valley Tribe.
 

 [16]
 

 . Assignments were also directly related to land.
 

 [17]
 

 . Similarly, the trial judge properly held that listing on Hoopa Schedule C (note 13,
 
 supra)
 
 did not carry with it automatic membership of those Indian children living on October 1, 1949. “The C children were themselves required for membership to have the Schedule C qualifications.” Consistently, the judge carried this over into Attachments C, D and E (note 14,
 
 supra;
 
 Appendix,
 
 infra).
 

 [18]
 

 . In one of their reply briefs on the merits, plaintiffs point to two alleged minor “errors” in the trial judge’s standards, and assert they were inadvertent and should be corrected. We are not certain those parts of Attachments B and E (note 14,
 
 supra;
 
 Appendix,
 
 infra)
 
 were inadvertent, but in any event we leave those plaintiffs excluded by these alleged errors to possible individual relief under the doctrine of “manifest injustice” if other facts show that those individuals should be included in the class entitled to recover.
 

 [19]
 

 . We do not pass on the question whether a plaintiff “dual member” who accepts money in this case will then be barred from receiving other monies from different, separate tribes or groups. That is not an issue before us.
 

 [20]
 

 . The 1973 decision of the Court of Claims specifically found that residence was not required for inclusion on Schedule A. 202 Ct.Cl. at 963 (Fdg. 148).
 

 [21]
 

 . The belated contention of the Hoopa Valley Tribe that plaintiffs, to receive monies under 25 U.S.C. § 407 (related to payments from the fruits of unallotted lands), must be members of an organized Indian entity is unacceptable for reasons given in Part I, B,
 
 supra,
 
 in our discussion of the relationship between 25 U.S.C. § 407 and the current jurisdictional issue.